2007 VT 136

## Edward Tateosian and Margaret Tateosian v. State of Vermont and Aero Industries, Inc. v. Vermont Municipal Truck Equipment & Supplies, Inc.

[945 A.2d 833]

No. 05-574

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed December 21, 2007

*William H. Sorrell*, Attorney General, *William E. Griffin*, Chief Assistant Attorney General, and *Eve Jacobs-Carnahan*, Assistant Attorney General, Montpelier, for Third-Party Plaintiff-Appellant.

*John E. Brady* and *Brendan P. Donahue* of *Brady & Callahan, P.C.*, Springfield, for Third-Party Defendant-Appellee/Cross-Appellant Vermont Municipal Truck Equipment & Supplies, Inc.

¶ 1. **Dooley, J.** In this contractual duty-to-defend case, both parties — third-party plaintiff, the State of Vermont, and third-party defendant, Vermont Municipal Truck Equipment & Supplies, Inc. (VMT) — appeal the judgment of the superior court. In relevant part, the court concluded that VMT had a limited duty to defend the State and awarded the State $5430 in attorney's fees. On appeal, the State argues that the court erred by: (1) concluding that VMT's duty to defend terminated after only several months of litigation; (2) limiting VMT's duty to defend to only one of the claims against the State; and (3) apportioning costs between the covered and uncovered claims. The State also seeks prejudgment interest on its costs and expenses. VMT cross-appeals, claiming that the court erred in: (1) granting the State judgment on the pleadings; (2) denying VMT a jury trial; (3) granting the State a monetary reward; and (4) refusing to consider VMT's

defense that the State breached its covenant of good faith and fair dealing. We conclude that VMT had no obligation to defend the State and reverse.

¶ 2. This litigation arises from an automobile accident that occurred in January 2000 when a metal chain cover from a State of Vermont snowplow truck flew off and crashed into the windshield of Edward and Margaret Tateosian's car, injuring Edward Tateosian. The steel chain cover for the dump truck mechanism was located behind the driver's door and was manufactured by Aero Industries, Inc. (Aero). In January 1996, VMT supplied and installed the cover on the truck pursuant to a procurement contract with the State. The bid documents specified that the dump-truck cover "must be suitable for use with asphalt, gravel, and salt. Aero Industries, Inc. Easy Cover model 400 or acceptable equal." The standard form procurement-and-installation contract prepared by the State Division of Purchasing also included a liability provision, specifying that "[t]he contractor shall indemnify, defend and hold harmless the State and its officers and employees from liability and any claims, suits judgments, and damages arising as a result of the Contractor's performance of this contract."

¶ 3. The Tateosians filed suit against the State for negligence and against Aero for product defect. In their suit against the State, plaintiffs alleged that the self-tapping screws that held the cover in place "came loose because of rust and excessive corrosion." Plaintiffs alleged that the State was negligent in accepting the chain cover because it was "not suitable for transportation of nor exposure to salt and the elements." (Hereinafter referred to as the negligent-acceptance claim.) They also claimed that the State was negligent because it failed "to properly inspect and maintain the chain cover in question when the presence of excessive rust and corrosion presented an obvious danger." (Hereinafter referred to as the negligent-maintenance claim.) Against Aero, plaintiffs alleged that the chain guard was defective and was negligently designed.

¶ 4. The State brought third-party indemnity and duty-to-defend claims against VMT. The State alleged that it had relied upon the expertise of VMT "in installing these material covers on the dump bodies" and relied upon VMT to provide information regarding the appropriateness of using self-tapping screws to attach the chain guard and for instructions regarding "the inspection and mainte-

nance of these self-tapping screws." The State sought a declaratory judgment that VMT was required to defend the Tateosian claims against the State and indemnify the State if it were found negligent. In its third-party complaint, the State did not allege that VMT was negligent. Both the State and VMT filed cross-claims against Aero, claiming product defect.

¶ 5. The State filed for judgment on the pleadings on the duty-to-defend issue. On August 7, 2003, the court ruled on the pleadings that VMT was obligated to defend the State "insofar as that defense relates to Plaintiffs' claim that the dump body covers were unsuitable when the State took delivery." The court reasoned that the negligent-acceptance claim *"potentially* falls within the parameters of the indemnification provision." VMT never assumed the State's defense, however, because the parties were unable to reach an agreement on sharing representation for the two claims. VMT offered to provide the State with an attorney to defend against the negligent-acceptance claim, but the State refused this offer, demanding that VMT provide a complete defense as well as prosecute the cross-claim against Aero.

¶ 6. On October 13, 2004, plaintiffs filed a motion to dismiss the negligent-acceptance claim without prejudice. The State opposed this motion, arguing that if the claim was dismissed without prejudice, plaintiffs could raise the issue at a later date and possibly subject the State to multiple trials. Upon the court's suggestion that the claim be dismissed with prejudice, plaintiffs' attorney refused, explaining that, although he had no evidence to support the claim, he was not entirely satisfied that rust and corrosion did not cause the accident. The court declined to dismiss the claim without prejudice, and the claim remained.

¶ 7. At trial, the court bifurcated the liability claims in plaintiffs' complaint from the State's third-party claims for defense and indemnification against VMT. First, the court held a jury trial on the liability issues. On the third day of trial, the State reached a settlement with Aero and dismissed its indemnity claim against VMT. On the fourth day of trial, the State admitted liability. The jury rendered a verdict in favor of Edward Tateosian for $275,000 and in favor of Margaret Tateosian for $35,000. In addition, the court entered judgment as a matter of law for the State on plaintiffs' negligent-acceptance claim.

¶ 8. The court then held a bench trial on the State's duty-to-defend claim against VMT. The court concluded that VMT had a

limited duty to defend, consistent with the earlier ruling on the motion for judgment on the pleadings, and awarded the State $5430 in defense costs. The court held that the State was entitled to a defense only on the negligent-acceptance claim and that plaintiffs had abandoned that claim in April 2003 and, consequently, the State was not entitled to attorney's fees after that time. Following VMT's motion for clarification, the court ruled that it would not consider VMT's defense for breach of the covenant of good faith, explaining that VMT waived the argument, having failed to raise it following the State's motion for judgment on the pleadings. Both parties appeal the court's decision.

¶ 9. On appeal, the State argues that VMT had a duty to provide a complete defense — defending against both of the Tateosians' direct claims and prosecuting the cross-claim against Aero — based on alternative theories. The State contends that under the terms of its contract with VMT, VMT had a duty to defend the State against the negligent-maintenance and negligent-acceptance claims, as well as in its cross-claim against Aero. Further, the State argues that even if the contract language applied only to the negligent-acceptance claim, VMT had to provide a full defense as part of its legal duty to defend.

¶ 10. Although the superior court took evidence, the duty-to-defend issue presented in this appeal is a question of law, which we review de novo. *City of Burlington v. Nat'l Union Fire Ins. Co.*, 163 Vt. 124, 127, 655 A.2d 719, 721 (1994); see *Fireman's Fund Ins. Co. v. CNA Ins. Co.*, 2004 VT 93, ¶ 8, 177 Vt. 215, 862 A.2d 251 (explaining that interpreting a contract is a question of law that we review de novo). Indeed, the superior court decision on appeal relied on the earlier decision made on the pleadings. For a judgment on the pleadings, we assume all factual allegations in the nonmoving party's pleading are true. *Knight v. Rower*, 170 Vt. 96, 98, 742 A.2d 1237, 1239 (1999).

¶ 11. The State's position on appeal, as well as its position in the trial court, is based on two fundamental propositions: (1) the standards applicable to VMT's duty to defend are the same as if VMT were an insurer under a liability insurance policy; and (2) under the contractual language, VMT had a duty to defend on at least one of plaintiffs' claims against the State. Because we conclude that the State is incorrect on both of these fundamental propositions, we hold that the superior court erred only to the extent that it awarded the State any defense costs.

¶ 12. On the first proposition, the superior court made its initial decision that VMT had a duty to defend the negligent-acceptance claim based on the standard used in insurance law, and determined the scope of a duty to defend "by comparing the allegations in the complaint of the underlying suit to the terms of coverage in the policy." *City of Burlington*, 163 Vt. at 127, 655 A.2d at 721. The State's position is that the court did not fully apply insurance law. Thus, it argues that once VMT had the duty to defend on one claim, it had the duty to defend on all claims in plaintiffs' complaint against the State, as well as to provide representation on the State's cross-claim against Aero. It also argues that the indemnity provisions of the State's contract with VMT, including the language on the duty to defend, must be construed to resolve all ambiguities in favor of the State, as if the indemnity provisions were in an insurance policy.

■ ■ ¶ 13. We recognize that some jurisdictions have followed the State's approach and have concluded that the legal obligations stemming from contractual indemnity do not differ from those involved in insurance law. See, e.g., *Pancakes of Hawaii, Inc. v. Pomare Props. Corp.*, 944 P.2d 83, 88-89 (Haw. Ct. App. 1997) (holding that in contractual duty-to-defend cases, as in insurance cases, the duty to defend must be determined at the beginning of the suit on the pleadings); *St. Paul Fire & Marine Ins. Co. v. Crosetti Bros., Inc.*, 475 P.2d 69, 71 (Ore. 1970) (noting that defendant's contractual duty to defend was identical to that of an insurer); *English v. BGP Int'l, Inc.*, 174 S.W.3d 366, 372 n.6 (Tex. Ct. App. 2005) (concluding that an indemnitor's contractual promise to defend involves same principles as insurer's duty to defend). As VMT points out, other jurisdictions, however, have concluded that the obligations assumed through contractual indemnity differ from those an insurance company agrees to provide. For example, as one court explained, while insurance contracts are contracts of adhesion and thus construed against the insurer, as the stronger bargaining power, noninsurance indemnity agreements should be construed against the indemnitee because subcontractors who indemnify general contractors occupy an inferior bargaining position. *Goldman v. Ecco-Phoenix Elec. Corp.*, 396 P.2d 377, 382 (Cal. 1964). This rationale applies to the current case, where the indemnity language was drafted by the State and included on a standard purchasing form as language applicable to any vendor who did business with the State. The United States Supreme

Court has noted in this context that the relationship between the federal government and a particular government contractor is one of "a vast disparity in bargaining power and economic resources between the parties." *United States v. Seckinger*, 397 U.S. 203, 212 (1970). While this broad generalization may not fully apply to the State of Vermont, it underscores the difference in the relationship between the State and its vendor versus the one between an insured and insurance company. Insurance companies have broader defense obligations because "an insurance company's agreement to defend actions against the insured is one of the 'fundamental obligations' of the insurance contract; in contrast, the agreement to defend and indemnify in a [commercial contract] is incidental to the main purpose of the agreement . . . ." *Ervin v. Sears, Roebuck & Co.*, 469 N.E.2d 243, 249 (Ill. App. Ct. 1984) (citation omitted).

¶ 14. Our precedents are more consistent with the approach suggested by VMT. In construing the language of an insurance policy, we apply the rule that all ambiguities are resolved in favor of the insured. See *Fireman's Fund Ins. Co.*, 2004 VT 93, ¶ 9. In indemnity cases, we interpret the language "to give effect to the intent of the parties as that intent is expressed in their writing." *Hamelin v. Simpson Paper (Vt.) Co.*, 167 Vt. 17, 19, 702 A.2d 86, 88 (1997). If the language is clear, then "the intent of the parties is taken to be what the agreement declares." *Id.* We have not applied insurance law to determine the interpretation of contractual provisions on the duty to defend or indemnify.

¶ 15. Thus, while we hold that insurance law principles do not apply completely to noninsurance contractual indemnity relationships, they may be helpful to resolve individual issues. For example, the superior court here ruled that VMT's duty to defend should be determined at the outset of the case against the indemnitee and based on the pleadings. We agree that in contractual indemnity situations, an indemnitor's obligation to defend should be determined at the beginning of the case based on the pleadings. See *George Sollitt Corp. v. Howard Chapman Plumbing & Heating, Inc.*, 836 P.2d 851, 852-53 (Wash. Ct. App. 1992) (resolving duty to defend in contractual indemnity case at the time of the tender of a defense, but refusing to apply the strict test used in insurance cases).

¶ 16. We turn then to the second proposition — .that the contract language created a duty to defend based on the language

in the contract. Under that language, VMT promised to defend the State against claims "arising as a result of [VMT's] performance of this contract." The critical question is thus whether the allegations in the original complaint were claims that arose out of VMT's performance of the contract. In addressing this question, we first note that plaintiffs' complaint did not name VMT as a defendant or contain an allegation that VMT was negligent or engaged in any conduct that made it liable to plaintiffs. Moreover, the State's cross-claim against VMT did not allege that VMT had been negligent. Thus, the State's argument has to be that the act of selling the installed chain guard to the State was the "performance" referenced in the contract, and the obligation to defend and indemnify encompassed any injury that resulted from the chain guard any time after the sale.

¶ 17. If interpreted to cover this case, the language of the indemnity provision becomes extremely broad and vague. As the United States Court of Appeals for the Fifth Circuit observed about similar language in an indemnity provision:

> While the language is well adapted to defining the areas of the application, it is not peculiarly apt to define causes either in terms of physical or legal responsibility. An injurious incident could arise out of, or result from, or be sustained, in connection with the performance of the work whether the real or legal cause was that of the Indemnitor, the Indemnitee, or both, or, equally likely, unrelated third parties. And to these questions as to what parties brought about the incident, there would have to be added inquiry whether any of those actually responsible for it were so in law. If it could cover any one or all of the three actual possibilities and any one or more or all of the legal possibilities, it has hardly spelled out that it will cover the specific and limited, but serious, situation of negligence by the Indemnitee. Of course that is just the very reason for the general principles now universally accepted. For this general approach is bottomed on the concept that this must be specifically, not generally, prescribed.

*Batson-Cook Co. v. Indus. Steel Erectors*, 257 F.2d 410, 413-14 (5th Cir. 1958). The principle the court described as "universally accepted" is that an indemnity provision covers the sole negligence

of the indemnitee only if the language clearly expresses that intent. *Id.* at 412; *Seckinger*, 397 U.S. at 211 ("This principle, though variously articulated, is accepted with virtual unanimity among American jurisdictions."); see *Fowler v. Boise Cascade Corp.*, 739 F. Supp. 671, 675 (D. Me. 1990); *Hollingsworth v. Chrysler Corp.*, 208 A.2d 61, 64 (Del. Super. Ct. 1965) (holding that agreement must clearly and unequivocally include indemnification for indemnitee's own negligence); *Dirk v. Amerco Mktg. Co. of Spokane*, 565 P.2d 90, 93 (Wash. 1977) (strictly construing clauses purporting to exculpate an indemnitee from its own negligence as a rule of construction in interpreting indemnity contracts). If the principle is applicable here, it means that the broad and general language of the indemnity provision is insufficient to cover the sole negligence of the indemnitee for the actions that give rise to its liability as the court held in *Batson-Cook*. An indemnity provision that covers liability arising out of the "contractor's performance" cannot be fairly stretched to cover liability arising out of the State's performance.

¶ 18. Although we have recognized this general rule, we have twice reserved adoption of it because we found that, in those cases, it would not have changed the outcome. In the first case, *Furlon v. Haystack Mountain Ski Area, Inc.*, an employee of a ski area was injured while fixing a ski lift, sued and obtained a judgment against the manufacturer of the ski lift based on its negligence in the design and manufacture of the lift. 136 Vt. 266, 388 A.2d 403 (1978). He then sued to collect the judgment from the ski area as a third-party beneficiary of an indemnity agreement between the manufacturer of the ski lift and the ski area. The ski area successfully argued that the indemnification provision "should not be construed to protect an indemnitee from his own negligence unless such an intention is expressly stated," and prevailed below. *Id.* at 268, 388 A.2d at 405. We acknowledged that the trial court followed the generally accepted rule, but stated that "the question is an open one in Vermont and in this case we think the reasons for that rule are absent." *Id.* at 269, 388 A.2d at 405. For three reasons, we held that the generally accepted rule could not prevail.

¶ 19. First, we explained that applying the rule would nullify the purpose of the indemnity provision:

> The lower court's reading of the [indemnity] clause would render that clause a nullity. If the intention of the

parties was that Haystack should be liable for its own conduct only, there would have been no reason to include the subject clause. This case is distinguishable from those in which a manufacturer indemnifies a buyer against liability for the manufacturer's negligence. Such a clause serves a purpose in those cases because there the buyer, as Haystack here, could be liable for injury to a customer or employee even though the defect causing the injury was wholly attributable to the manufacturer. In the reverse situation presented here, a clause which simply indemnified [the ski lift manufacturer] against liability for Haystack's negligent acts would be unnecessary, because [the manufacturer] — not having breached any duty — could not be held liable for injuries resulting from Haystack's negligence. We should avoid constructions which render ineffectual the language of a contract.

*Id.* at 268-69, 388 A.2d at 405 (citations omitted).

¶ 20. Second, we explained that the indemnity provision was not ambiguous and covered the accident that caused the plaintiff's injuries. *Id.* at 269, 388 A.2d at 405. Third, the trial court's result was not motivated by considerations of public policy because the disparity in bargaining power, addressed by the United States Supreme Court in *Seckinger*, was not present and the effect of the indemnity provision was to put on the ski area the burden of purchasing insurance, an obligation that was also specifically created in the contract. *Id.* at 269-70, 388 A.2d at 405.

¶ 21. In the second case, *Hamelin*, a contractor, Vescom, supplied security services for the defendant paper company, and the plaintiff, a security guard employed by Vescom, was injured when he stepped on a wooden stair that gave way. 167 Vt. 17, 702 A.2d 86. He sued the paper company for negligent maintenance of the stair, and the paper company brought in Vescom as a third party under an indemnity provision in the security services contract. This Court found that the indemnity agreement controlled, but again we reserved adopting the general rule on construing indemnity agreements. *Id.* at 20-21, 702 A.2d at 89. First, the indemnity agreement explicitly contemplated the circumstances of the accident and "used expansive and unambiguous language to define Vescom's obligation." *Id.* at 20, 702 A.2d at 88. Second, in response to an argument that indemnifying the paper

company for its own negligence offended "the public policy underlying the law of premises liability," we held that *Furlon* controlled because the indemnity agreement was an "arms-length business deal" which allocated the cost of purchasing insurance to Vescom, a purchase that was also independently required in the contract. *Id.* at 20-21, 702 A.2d at 89.

¶ 22. The reasons that we reserved adoption of the general rule in *Furlon* and *Hamelin* do not apply here. Unlike *Furlon*, the indemnity clause here is ambiguous. Indeed, in construing the words "contractor's performance," it is a stretch to apply these terms to a situation where the sole performance alleged to create liability is that of the State. This is a government contract drafted by the State, and the indemnity provision is standard contract language, so that the general point of *Seckinger* is applicable, even if the "vast disparity in bargaining power" is not. Moreover, the indemnity clause is not linked to an insurance-purchase requirement.

■ ■ ¶ 23. For the reasons stated and under these circumstances, we adopt the general rule that an indemnity clause covers the sole negligence of the indemnitee only where it clearly expresses that intent. In doing so, we stress that the holdings in *Furlon* and *Hamelin* remain good law. We further hold that the language of the indemnity provision in this case does not clearly express that intent. Thus, we cannot accept the second proposition behind the State's appeal — that under the contract language, VMT had an obligation to indemnify it on at least some claims in the complaint. We hold that plaintiffs' complaint did not raise a duty for VMT to indemnify. In the absence of a claim that was potentially covered by the obligation to indemnify, VMT had no duty to provide the State a defense to plaintiffs' action.

■ ¶ 24. VMT has cross-appealed, arguing first that the superior court erred in granting partial judgment on the pleadings and requiring VMT to defend on the negligent-acceptance claim. Consistent with our holding that there is no duty to defend the State against the claims in plaintiffs' complaint, we agree that it was error for the superior court to order VMT to defend even part of the complaint. As a result, the award of $5340 in attorney's fees to the State to cover the defense of the negligent-acceptance claim was error.

¶ 25. Because we have concluded that judgment should have been entered for VMT, we do not reach the State's arguments

regarding apportionment of defense costs between the claims in plaintiffs' complaint and entitlement to prejudgment interest. For the same reason, we do not reach the remainder of VMT's cross-appeal arguments.

*Reversed; judgment is entered for third-party defendant, Vermont Municipal Truck Equipment & Supplies, Inc.*