2013 VT 119



State v. Prison Health Services,
Inc. (2012-380)

 

2013 VT 119

 

[Filed 20-Dec-2013]

 

NOTICE:  This opinion is
subject to motions for reargument under V.R.A.P. 40 as well as formal revision
before publication in the Vermont Reports.  Readers are requested to
notify the Reporter of Decisions by email at: JUD.Reporter@state.vt.us or by
mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont
05609-0801, of any errors in order that corrections may be made before this
opinion goes to press.

 

 


 2013 VT 119
 
  


 No. 2012-380
 
  


 State of Vermont
 
 
 Supreme Court
 
 
  
 
 
  
 
 
  
 
 
 On Appeal from
 
 
      v.
 
 
 Superior Court, Chittenden
 Unit,
 
 
  
 
 
 Civil Division
 
 
  
 
 
  
 
 
 Prison Health Services, Inc.
 
 
 May Term, 2013
 
 
  
 
 
  
 
 
  
 
 
  
 
 
 Mary
 Miles Teachout, J.
 
 
  
 
 William H. Sorrell, Attorney General, and Mark J. Patane,
Assistant Attorney General,

  Montpelier, for
Plaintiff-Appellant.

 

Samuel Hoar and Sophie E. Zdatny of Dinse, Knapp &
McAndrew, P.C., Burlington, for

  Defendant-Appellee.

 

Shannon A. Bertrand of Kenlan, Schwiebert, Facey & Goss,
P.C., Rutland, for 

  Intervenor-Appellee James Gipe, Administrator of the
Estate of Ashley Ellis.

 

 

PRESENT:   Dooley, Skoglund, Burgess and Robinson, JJ., and Devine, Supr. J., 

                    
Specially Assigned

 

 

¶ 1.           SKOGLUND,
J.   The case before us involves a contract dispute between the
State of Vermont and Corizon Health, Inc., formerly known as Prison Health
Services, Inc. (PHS).  The State appeals a declaratory judgment ruling
that PHS is not contractually obligated to defend the State and its employees
against certain claims brought by the estate of decedent, who died while in the
custody of the Department of Corrections.  We reverse, and conclude that
PHS has a duty to defend.

¶ 2.           In
January 2007, PHS entered into a twenty-four million dollar contract with the
State to provide all medical services to inmates in the custody of the
Department in compliance with all laws and national health care
standards.  In addition to outlining the specific terms of the service
agreement, the contract contained an indemnification provision requiring PHS to
“indemnify, defend and hold harmless the State and its officers and employees
from liability and any claims, suits, judgments, and damages which arise as a
result of [PHS]’s acts and/or omissions in the performance of services under
this contract.”  The question presented is whether, under this
contractual language, PHS is obligated to defend the State and its employees
for certain claims in a lawsuit brought by decedent’s estate.

¶ 3.           In
contractual duty-to-defend cases, “an indemnitor’s obligation to defend should
be determined at the beginning of the case based on the pleadings.”  Tateosian
v. State, 2007 VT 136, ¶ 15, 183 Vt. 57, 945 A.2d
833.  For a judgment on the pleadings, we assume all factual
allegations in the nonmoving party’s pleadings are true.  Knight v. Rower, 170 Vt. 96, 98, 742 A.2d 1237, 1239 (1999). 


¶ 4.           The
events on which the pleadings are based are as follows.  On August
14, 2009, decedent began serving a thirty-day sentence at the Northwest State
Correctional Facility in Swanton, Vermont.  At the time of her
incarceration, decedent suffered from an eating disorder and weighed only
ninety pounds.  As a result of her eating disorder, decedent also suffered
from hypokalemia, a life-threatening condition linked to dangerously low potassium
levels.  When she entered the prison, decedent was taking a potassium
supplement called K-Clor to treat the hypokalemia. The facility was given
notice of decedent’s medication needs prior to her admission.  

¶ 5.           On
the day decedent entered the facility, PHS was short-staffed.  The
facility had no potassium supplement in stock, and none was obtained during
decedent’s incarceration.  On the morning of August 16, 2009, two days
after entering the correctional facility, decedent was found nonresponsive in
her cell by correctional officers.  Neither PHS nor the correctional
officers were able to locate a cardiopulmonary-resuscitation (CPR) mouth guard,
delaying resuscitation attempts.  Decedent was taken to Northwestern
Medical Center, where she was pronounced dead.  The medical examiner found
that she died from a hypokalemic-induced cardiac arrhythmia resulting from a
lack of potassium. 

¶ 6.           Decedent’s
estate, through its administrator James Gipe, made claims against both PHS and
the State.  PHS privately settled with the administrator before any
lawsuit was filed.  Part of the terms of the settlement included a
Covenant Not to Sue, in which the administrator agreed not to bring any claims
against PHS, including any claims against the State for which PHS could owe a
duty of defense or indemnification.  

¶ 7.           In
July 2011, the administrator filed a lawsuit against the State and several
state employees in Rutland Superior Court.  See Gipe v. State,
Docket No. 515-7-11 Rdcv.  In an amended complaint, the Administrator
strategically tailored the estate’s claims to remove PHS actors from the suit,
at least nominally, alleging five different causes of action: (1) cruel and
unusual punishment; (2) intentional infliction of emotional distress; (3)
negligence; (4) punitive damages; and (5) wrongful death.  Only four of
these claims are at issue here; the State concedes that PHS is not obligated to
defend it against allegations of taunting by corrections officers that make up
the estate’s claim for intentional infliction of emotional distress and part of
the cruel and unusual punishment claim.  

¶ 8.           The
State filed a declaratory judgment action, seeking a declaration that PHS has a
duty to defend the State against the claims asserted in Gipe v. State. 
It attached a copy of the contract between the State and PHS, a copy of the
original complaint in Gipe v. State, and a copy of the subsequently
amended complaint.  After hearing arguments, the trial court granted PHS
judgment on the pleadings sua sponte, finding that “[t]here are no allegations
of wrongdoing by PHS personnel that form the basis for a claim, and thus the
duty to defend is not triggered.”  On that basis, the court held that the
State failed to meet its burden of showing that PHS had an obligation to defend
based on the terms of the contract.  On appeal, the State continues to
argue that PHS has a duty to defend the State and its employees against the
estate’s claims, insofar as the claims are not based on the sole actions of the
State.[1] 


¶ 9.           Whether
PHS has a duty to defend the State in the matter of Gipe v. State is a
question of law, which we review de novo.  See Tateosian, 2007 VT
136, ¶ 10; see also Dep’t of Corr. v. Matrix Health Sys., P.C.,
2008 VT 32, ¶¶ 11-12, 183 Vt. 348, 950 A.2d 1201 (explaining that our
review of the trial court’s interpretation of the parties’ contract is
nondeferential).  We have held that insurance law principles, which would
resolve all contractual ambiguities in favor of the insured, do not completely apply in cases involving a noninsurance
contractual indemnity relationship.[2] 
See Tateosian, 2007 VT 136, ¶ 15.  Rather, we interpret the
indemnification provision of the contract to give effect to the intent of the
parties as it is expressed in their writing.  Hamelin
v. Simpson Paper Co., 167 Vt. 17, 19, 702 A.2d 86, 88 (1997). 
When the contract language is unambiguous, the intent of the parties is rooted
in the words of the document, where the plain meaning of the language governs
its interpretation.  Southwick, 2011 VT 53,
¶ 4.  “We assume that parties included contract provisions for
a reason, and we will not embrace a construction of a contract that would
render a provision meaningless.”  Id. (quotation omitted).
  In short, we will enforce the contract as written.

¶ 10.       Here, the
contract’s indemnification provision stated that PHS would “indemnify, defend
and hold harmless the State and its officers and employees from liability and
any claims, suits, judgments, and damages which arise as a result of [PHS]’s
acts and/or omissions in the performance of services under this contract.”
 The contract further stated that this provision 

 is intended
by the parties to include (i) defense of all claims, and/or lawsuits, including
but not limited to actions for damages and/or for declaratory or injunctive
relief, to the extent that they contain allegations that arise as a result of
[PHS’s] negligence in the performance of services under this contract and/or
intentional misconduct in the performance of services under this contract
(intentional conduct to include, without limitation, any intentional violation
of law or duty of care to any inmate) whether or not [PHS], an employee of
[PHS], or a subcontractor of [PHS] is a named party to the
action . . . . The parties do not intend [the
indemnification provision] to include liability or defense for any allegations
that arise as a result of the acts (including intentional misconduct),
omissions, policies, or procedures or any other conduct attributable to the
State, its agents, officers or employees.  

The contract plainly states here
that both parties intended for PHS to defend the State against claims where
such claims “contain allegations that arise as a result of [PHS’s] negligence”
in the performance of the medical services specified in the contract.  The
issue, then, is not the plainness of the language, but “whether the allegations
in the original complaint were claims that arose out of the [contractor’s]
performance of the contract.”  Tateosian, 2007 VT
136, ¶ 16.

¶ 11.       Before we turn to
the claims themselves, however, we address PHS’s argument as to how the
indemnity clause should be interpreted.  PHS contends that because the
contract does not expressly state that PHS will defend
“acts . . . omissions, policies or procedures or any other
conduct” solely attributable to the State, PHS should not be required to
defend against any independent conduct of State employees “regardless of
whether [PHS] may separately have contributed to the alleged harm or
injury.”  We disagree with this reasoning.  The contract clearly
outlines the possibility of a case where PHS would be required to defend the
State against claims arising from PHS’s negligence “whether or not . . . [it] is a named party to the
action.”  If PHS was correct in its interpretation of the contract, and
could not be required to defend the State against any action involving both PHS
and State actors, we have trouble envisioning a situation where this phrase
would apply.  Rather, the presence of this “whether or not” clause is a
persuasive indication that both parties intended for PHS to defend the State
against claims involving negligence by both parties, to the extent that they
arise as a result of PHS’s negligence in its performance of contracted
services.  

¶ 12.       Having determined
that the contractual language does not excuse PHS from its duty to defend the
State, we address the critical question of whether the estate’s allegations
against the State arise from PHS’s performance of the contract.  In so
looking, we focus on the “factual allegations in [the complaint] and not on the
legal theories asserted.”  TBH v. Meyer, 168 Vt.
149, 153, 716 A.2d 31, 35 (1998).  As such, we address the facts
set forth in the complaint against the State, which are “re-state[d] and
re-incorporate[d]” into each of the four claims relevant to this case.[3]  Taking these factual allegations as
true, Goodby v. Vetpharm, Inc., 2009 VT 52, ¶ 3, 186 Vt. 63, 974
A.2d 1269, we conclude that the estate’s grievances arise from negligent
conduct by both the State and PHS in its performance of contracted
services.  Thus, we hold that PHS has a duty to defend the State against
these claims. 

¶ 13.       Among the facts
that the estate alleges in the amended complaint are the following: (1) “the
facility did not have K-Clor in stock and the staff did not obtain it during
her incarceration”; (2) the State “did not have adequate procedures for
obtaining out of stock medications”; (3) “neither [PHS] nor the correctional
officers were able to locate a CPR mouth guard” causing a delay in
resuscitation efforts; (4) the State “failed to ensure that procedures were in
place to deliver promised information and communications with medical staff”;
and (5) the State was aware of and contributed to short-staffing at the
facility.    

¶ 14.       Addressing each
fact in turn, we begin with the assertion that the facility did not have any
K-Clor in stock and did not obtain it or administer it to decedent during her
incarceration.  As one of the specific roles outlined in the contract, PHS
was to conduct all initial medical screening of inmates, whereby PHS staff were
to ascertain any “illnesses, health conditions, and special requirements” of an
inmate, including any currently prescribed medications.  Any such
medications were to be “made available to the inmate in accordance with established
protocols.”  The establishment of said protocols were
in turn part of PHS’s contractual obligations regarding pharmaceuticals. 
This section of the contract particularly mandated that PHS “provide a total
pharmaceutical system in compliance with [national] standards that is
sufficient to meet the needs of the DOC inmates.  [PHS] shall also be
responsible for the acquisition, storage and administration of
pharmaceuticals.” (Emphasis added.)  The contract plainly indicates
that one of the contractual services PHS was obligated to provide was
identifying an inmate’s need for medication and acquiring the necessary
pharmaceuticals. As such, PHS is implicated in whatever negligence led to
decedent’s failure to receive the potassium supplement she needed.  

¶ 15.       The second fact,
that the State did not have adequate procedures for obtaining out-of-stock
medication, also falls directly under the purview of PHS’s contracted
services.  As one prong of the “total pharmaceutical system” PHS was
contracted to create, the contract stipulates that there be a medical
administration program that “shall contain internal controls for reorder [of
pharmaceuticals] . . . . The
system must ensure the provision of continuous pharmaceutical therapy.” 
This contractual directive clearly assigned PHS the task of creating and
managing an organizational system for the stocking and reordering of medication
for inmates.  The responsibility for a critical failure of such a system
must, therefore, also be assigned to PHS—at least in so much as any other party
is responsible.  PHS thus fails in its claim that it bears no
responsibility when decedent failed to receive necessary continuous
pharmaceutical therapy.  Where a contract so directly lays out the
requirement that a contractor create and maintain a system of responsible
services and the system experiences a total shutdown, the contractor is
implicated in the resulting action.

¶ 16.       Likewise, when
the estate asserts that both PHS and the State failed to locate a CPR mouth guard,
delaying efforts to resuscitate decedent, PHS is most certainly
implicated.  PHS is not only actually named here, but was also
contractually obligated to provide an immediate response to decedent’s medical
emergency.  The contract’s “emergency services” provision explicitly
stated that “[PHS] is required to provide an immediate response to inmates in
an emergency situation” and to have “specific written policies and procedures
to address emergency response.”  An emergency measure so
basic as having a CPR mouth guard readily available certainly falls under the
broad cover of this language.  The subsequent failure of such a measure
and the delay to decedent in receiving immediate emergency care is thus
inescapably a failure of the emergency services PHS was plainly contracted to
provide, regardless of whether the State was also negligent.

¶ 17.       The estate
further asserts that the State failed to ensure that procedures were in place
to deliver promised medical information and communicate with PHS staff
regarding the critical care decedent needed.  Again, under the contract,
PHS was responsible for providing the very services the estate declares were
absent.  Specifically, the contract mandated that “[r]egular channels of
communication . . . be established and maintained between
[PHS]’s health care staff and the Facility Superintendent and facility staff to
ensure a continuum of care for sick inmates,” including inmates like decedent
who are “seriously ill with significant health conditions.”  Though the
State may be responsible for its fair share of the multiple communications
failures that occurred regarding decedent’s condition and her urgent need for
medication, it cannot be denied that communicating with State employees about
inmates with health concerns was a contractual duty for which PHS was
responsible.  The estate’s facts include that decedent “went through
intake procedures during which time she identified her health as an area of
concern.”  Since PHS was contracted to conduct health screenings of all
new inmates immediately upon intake, a logical conclusion is that PHS staff
took part in admission procedures where decedent’s health issues were
noted.  Further, communicating with facility staff on medical issues was a
contractual obligation.  Thus, any communication failure regarding
decedent’s condition is necessarily shared by PHS and the State.  

¶ 18.       Finally, in its
complaint, the estate heavily emphasizes that the State was aware of
short-staffing issues and contributed to the problem on the day of decedent’s
death by requiring a PHS employee to attend a meeting outside the
facility.  Yet we find in the contract that as part of PHS’s “performance
guarantees” it “shall be [PHS’s] final responsibility to fill all posts in
accordance with the staffing standards and coverage schedules” and that PHS
“must also ensure that no shift is left uncovered.”  It was, thus, PHS’s
responsibility—at least in part—to ensure that the facility was adequately
staffed.  This is enough to find that the allegations regarding
short-staffing arose as part of PHS’s actions or inactions.

¶ 19.       We could go on
through each of the factual allegations that make up the foundation of the
estate’s claims against the State to find contractual support for holding that
these allegations arise, at least partially, from PHS’s performance of
contracted services.  We need not continue, however.  Assuming the
factual allegations in the complaint to be true, it is clear that PHS’s
performance cannot be excluded from contributing to the unfortunate set of
circumstances which led to decedent’s untimely death.

¶ 20.       Even the court
below, despite ruling for PHS, acknowledged that “[t]here is no question that
some acts of PHS personnel are described in the complaint, and are part of the
context of the alleged acts.”  Nonetheless, the trial court held that “the
acts of wrongdoing identified as the grounds for each of the causes of action
are the acts of the state actor defendants, and not those of PHS
personnel.  There are no allegations of wrongdoing by PHS personnel that
form the basis for a claim.”  As evidenced by our discussion of the facts
alleged by the estate, we respectfully disagree with the trial court on this
point.  The claims asserted by the estate implicate both the State and PHS
in what occurred, both factually and under the terms of the contract.  We
note that the complaint as originally filed alleged that PHS was also provided
with decedent’s medical records prior to her incarceration, and that a doctor for
PHS confirmed that she should receive her medications while incarcerated. 
The original complaint further declared that “[n]either the
health care provider nor the correctional facility staff had an adequate
procedure for obtaining out of stock medications.”  

¶ 21.       While the amended
complaint apparently tried to eliminate allegations directed against PHS, the
claims made all focus on the medical services provided for decedent, thus
relating to services PHS was contractually obligated to provide, and necessarily
implicating PHS in the conduct surrounding decedent’s death.  Removing
specific allegations against PHS from the amended complaint does not relieve
its contractual obligation to defend the State in this matter. The estate’s
claims contain allegations that arise as a result of PHS’s provision of medical
services to inmates, and it must therefore defend the State against these
claims.  

¶ 22.       The scope of our
inquiry here is limited to whether PHS has an obligation to defend the State
based on the language of the contract’s indemnity clause.  Having
established that many of the key facts on which the estate’s claims are based
can be traced back to implicate PHS through its conduct and contractual
obligations, we are satisfied that the State has shown that the indemnity
clause applies.  We therefore reverse the trial court’s decision and
conclude that PHS does have a duty to defend the State against these claims.[4]  Because we hold as such, we need
not reach the State’s argument that the trial court erred by granting judgment
sua sponte to PHS.  Likewise, we do not address PHS’s argument that the
Covenant Not to Sue executed between PHS and the estate fulfills PHS’s duty to
defend.  As the State points out, it is not a party to that agreement, and
therefore the agreement is not part of the case before us.  

Reversed.

 


  
 
 
  
 
 
 FOR THE COURT:
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
 Associate
 Justice
 
  

 











[1] 
The State asks for a ruling only on the issue of whether PHS is obligated to
defend the State against the estate and not on the issue of indemnification,
which it states “is not yet ripe for determination.”  

 





[2]  In Tateosian, we noted that
other jurisdictions have concluded that obligations assumed through contractual
indemnity differ from those an insurance company agrees to provide.  Tateosian, 2007 VT 136, ¶ 13.  As an
example, we cited the situation where “noninsurance indemnity agreements should
be construed against the indemnitee because subcontractors who indemnify
general contractors occupy an inferior bargaining position.”  Id. 
We have, however, departed from this rule where the agreement is the result of
an arm’s-length deal and the facts suggest no true disparity in bargaining
power.  See Southwick v. City of Burlington, 2011 VT 53,
¶¶ 12, 14, 190 Vt. 106, 35 A.3d 113.  As
between the State and PHS, we have no doubt that both parties possess strong
business acumen and have commensurate resources on hand, leveling the playing
field of contract negotiation.  PHS was able to negotiate a twenty-four
million dollar contract with the State.  The contract was further amended
several times to increase the maximum payable amount in favor of PHS. 
This is suggestive of equal bargaining power among the parties.  Even if
we were to construe the contract against the drafter, there is disagreement as
to the identity of the drafter.  PHS claims it is the State, while the
State rebuts that there is no evidence in the record to confirm this and
proclaims it “highly unlikely that the State’s counsel was responsible for this
language.”  We need not delve further into this inquiry, however, as we
see no true disparity in bargaining power between the State and PHS.  





[3] 
PHS offers a refreshingly honest argument for denying the State’s request for
defense.  “Throughout the proceedings below, [PHS] sought to obtain a
ruling from the trial court that the Estate had successfully pled around
the release language contained in the Covenant Not to Sue because the Estate’s
allegations were specifically directed at actions or omissions taken by the
State’s employees . . . .”
(Emphasis added.)  





[4]
 We do not foreclose decedent’s estate from making additional amendments
to the complaint to more specifically allege independent wrongful conduct by
the State without implicating the acts or services provided by PHS.