Filed 11/28/23

VERMONT SUPERIOR COURT
Washington Unit
65 State Street
Montpelier VT 05602
802-828-2091
www.vermontjudiciary.org



CIVIL DIVISION
Case No. 21-CV-02614

| Trinity Services Group, Inc. v. State of Vermont, Department of Corrections |
| --- |

## Opinion and Order on Cross-Motions for Summary Judgment

Plaintiff Trinity Services Group, Inc., provides certain consulting services related to "food services" in Vermont correctional facilities to Defendant the Vermont Department of Corrections (DOC or the State). Pursuant to an indemnification provision in the parties' contract, Trinity defended the State and paid a portion of the settlement amount in a federal lawsuit filed by a prisoner against the State claiming that the DOC had failed to provide religiously appropriate halal meals to Muslim inmates. Following the settlement, Trinity sought to recoup its defense and indemnity expenses from the State, claiming no contractual responsibility for them. The State refused recoupment. Trinity then filed this action seeking to recover those expenses. The parties have filed cross-motions for summary judgment addressing the matter.[1]

Essentially, the controversy is as follows. The State asserts that the DOC consulted with Trinity when determining how to provide religiously appropriate meals to Muslim inmates. A Trinity representative provided bad advice, that kosher (Jewish) meals would satisfy halal (Muslim) standards. The DOC took the advice, leading to the

---

[1] The State initially asserted a counterclaim against Trinity. At this point, the counterclaim has been abandoned. The only issue in this case is Trinity's entitlement to recovery of its defense and indemnity expenses under the terms of the parties' indemnification agreement.

underlying litigation. In Trinity's view, it never provided any such guidance, it had no responsibility for the means by the which the DOC satisfied the need for religiously appropriate meals, and the DOC made its own decisions in that regard. Because it did nothing *negligent*, it argues, there can be no basis for its liability under the indemnification agreement, by which it is not responsible for the State's sole negligence.

## I. Procedural Standard

Summary judgment procedure is "an integral part of the . . . Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Morrisseau v. Fayette*, 164 Vt. 358, 363 (1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)). Summary judgment is appropriate if the evidence in the record, referred to in the statements required by Vt. R. Civ. P. 56(c)(1), shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Vt. R. Civ. P. 56(a); *Gallipo v. City of Rutland*, 163 Vt. 83, 86 (1994) (summary judgment will be granted if, after adequate time for discovery, a party fails to make a showing sufficient to establish an essential element of the case on which the party will bear the burden of proof at trial). The Court derives the undisputed facts from the parties' statements of fact and the supporting documents. *Boulton v. CLD Consulting Engineers, Inc.*, 2003 VT 72, ¶ 29, 175 Vt. 413, 427. A party opposing summary judgment may not simply rely on allegations in the pleadings to establish a genuine issue of material fact. Instead, it must come forward with deposition excerpts, affidavits, or other evidence to establish such a dispute. *Murray v. White*, 155 Vt. 621, 628 (1991). Speculation is insufficient. *Palmer v. Furlan*, 2019 VT 42, ¶ 10, 210 Vt. 375, 380. Where, as here, there are cross-motions for summary judgment, the parties

opposing summary judgment "are entitled to the benefit of all reasonable doubts and inferences." *Montgomery v. Devoid*, 2006 VT 127, ¶ 9, 181 Vt. 154, 156.

The material facts are not genuinely disputed. The parties differ sharply, however, as to the proper interpretation of the indemnification agreement.

II.     The Contract and Indemnification Agreement

On its first page, the Contract summarizes its subject matter as "personal services generally on the subject of facility food service consultation," with detailed services specified in Attachment A (Specification of Work to be Performed). Contract at 1. According to Attachment A, some of Trinity's ongoing responsibilities included evaluating and inspecting food service operations and purchasing, acting as an adviser and instructor, and conducting meetings to "problem-solve common issues." Contract at 5. "Contractor will work closely with cooks, facility food service supervisors, assistant superintendents', [sic] the [field operations manager (FOM)] (or designee), and the DHS to resolve dietary, budget, equipment, storage, sanitation and other related issues as they arise." *Id.*

Trinity also had substantial responsibility for "menu planning," which expressly contemplated religious meals: "The Contractor will design special diet plans (medical and/or religious) for all special diet requests from the State . . . . Contractor and dietician will work with the DHS or designee to reduce the special diet needs, as well as, with the FOM and the facility assistant superintendents to ensure religious accommodations are met." *Id.* at 7.

Attachment C to the Contract includes an indemnification provision as follows:

The Party shall defend the State and its officers and employees against all claims or suits arising in whole or in part from any act or omission of the

Party or of any agent of the Party.  The State shall notify the Party in the event of any such claim or suit.  The Party shall notify its insurance company and the State within 10 days of receiving any claim for damages, notice of claims, pre-claims, or service of judgments or claims, for any act or omissions in the performance of this Agreement.

After a final judgment or settlement the Party may request recoupment of specific defense costs and may file suit in Washington Superior Court requesting recoupment.  The Party shall be entitled to recoup costs only upon a showing that such costs were entirely unrelated to the defense of any claim arising from an act or omission of the Party.

The Party shall indemnify the State and its officers and employees in the event that the State, its officers or employees become legally obligated  to pay any damages or losses arising from any act or omission of the Party.

Contract at 11.

III.    Analysis

A.  Indemnification Agreements and *Tateosian*

For the most part, Vermont courts interpret express indemnification agreements "as we would other questions of contractual construction.  Where the language of the agreement is clear, the intention and understanding of the parties must be taken to be that which their agreement declares." *Lamoille Grain Co., Inc. v. St. Johnsbury and Lamoille County R. R.*, 135 Vt. 5, 8 (1976); *accord Hamelin v. Simpson Paper (Vermont) Co.*, 167 Vt. 17, 19 (1997).  "The fact that the parties may be in unequal bargaining positions is not enough alone to justify non-enforcement of a contract; practically every contract negotiation involves parties with some bargaining disparity." *Lamoille Grain*, 135 Vt. at 8.

Trinity relies heavily on *Tateosian v. State*, 2007 VT 36, 183 Vt. 57.  In that case, a "steel chain cover" flew off a State snowplow, causing injuries to the tort-plaintiffs, who

filed negligence claims against the State. VMT, the vendor, had sold the chain cover to the State and installed it years earlier. According to the decision, there was no claim by anyone that VMT had done anything negligent whatsoever in selling and installing the chain cover or otherwise. The decision is unclear factually as to why the State was at fault, but, as between the State and VMT, it is clear that the State was sole party at fault for the underlying injury. The question presented was whether VMT was liable in indemnity for the State's sole negligence under "a standard form procurement-and-installation contract prepared by the State Division of Purchasing [which] also included a liability provision, specifying that '[t]he contractor shall indemnify, defend and hold harmless the State and its officers and employees from liability and any claims, suits, judgments, and damages arising *as a result of the Contractor's performance* of this contract.'" *Id.*, 2007 VT 36, ¶ 2 183 Vt. at 59 (emphasis added).

The Court explained that the only performance by the vendor potentially at issue was its sale and installation of the chain cover, which was not negligent at all. The State apparently interpreted the indemnification agreement to provide indemnity for any liability involving the chain cover that ever arose under any circumstances, including the State's sole negligence. *See id.*, 2007 VT 36, ¶¶ 16–17, 183 Vt. at 64. The Court found the indemnification agreement ambiguous, at least in the circumstances of the case, and it noted the unequal bargaining power of the parties. It concluded: "An indemnity provision that covers liability arising out of the 'contractor's performance' cannot be fairly stretched to cover liability arising out of the State's performance." *Id.*, 2007 VT 36, ¶ 17, 183 Vt. at

65; *see also id.*, 2007 VT 36, ¶ 22, 183 Vt. at 67 ("Indeed, in construing the words 'contractor's performance,' it is a stretch to apply these terms to a situation where the sole performance alleged to create liability is that of the State.").

Expressly noting that prior case law remained valid, it then more broadly held that "we adopt the general rule that an indemnity clause covers the sole negligence of the indemnitee only where it clearly expresses that intent." *Id.*, 2007 VT 36, ¶ 23, 183 Vt. at 67; *see also Hemond v. Frontier Communications of America, Inc.*, 2015 VT 66, ¶ 29, 199 Vt. 259, 271 ("[T]his Court has described *Tateosian* as implementing the 'rule of construction' that 'an indemnity provision covers the sole negligence of the indemnitee only if its language clearly expresses that intent.'"). But, if that language is clear, it will be enforceable. *See Southwick v. City of Rutland*, 2011 VT 53, ¶ 13, 190 Vt. 106, 115 ("Unlike the words 'contractor's performance' in *Tateosian*, the indemnification language in the instant contract is deliberately broad enough to cover all injuries and damages that might occur—as a result of either party's negligence—. . . without being so broad as to lose meaning altogether.").

In *State v. Prison Health Services, Inc.*, 2019 VT 113, 195 Vt. 360, the Court clarified the bargaining-power issue in *Tateosian* as follows:

> In *Tateosian*, we noted that other jurisdictions have concluded that obligations assumed through contractual indemnity differ from those an insurance company agrees to provide. As an example, we cited the situation where "noninsurance indemnity agreements should be construed against the indemnitee because subcontractors who indemnify general contractors occupy an inferior bargaining position." We have, however, departed from this rule where the agreement is the result of an arm's-length deal and the facts suggest no true disparity in bargaining power. As between the State and PHS, we have no doubt that both parties possess strong business acumen and have commensurate resources on hand, leveling the playing field of contract

negotiation. PHS was able to negotiate a twenty-four million dollar contract with the State. The contract was further amended several times to increase the maximum payable amount in favor of PHS. This is suggestive of equal bargaining power among the parties. Even if we were to construe the contract against the drafter, there is disagreement as to the identity of the drafter. PHS claims it is the State, while the State rebuts that there is no evidence in the record to confirm this and proclaims it "highly unlikely that the State's counsel was responsible for this language." We need not delve further into this inquiry, however, as we see no true disparity in bargaining power between the State and PHS.

*State v. Prison Health Services, Inc.*, 2019 VT 113, ¶ 9 n.2, 195 Vt. 360, 364 (citations omitted). *Tateosian*, thus, does not stand for the proposition that indemnification agreements in State contracts always should be construed against the State, at least without some affirmative showing of the contractor's substantially diminished bargaining power.

In this case, according to the plain language of the indemnification agreement, the State is entitled to indemnity "against all claims or suits arising in whole or in part from any act or omission of" Trinity, and Trinity's right to recoupment is limited to those costs that were "entirely unrelated to the defense of any claim arising from" Trinity's acts and omissions. In other words, if the State's acts or omissions are the exclusive cause of the claims, there is no indemnity. But if Trinity's acts or omissions at least partially caused the claims, Trinity has indemnification liability.

Trinity argues that the indemnification agreement must be construed against the State, and must be interpreted to extend to the State's "sole negligence." Neither argument aids Trinity. There is no showing of any substantial disparity in bargaining power that might cause the Court to construe the indemnification agreement against the State. More importantly, the agreement is not ambiguous. It is broad, but not so broad as to lack all

meaning. Rather, it applies if a claim arose at least in part due to an act or omission of Trinity. The factual question in this case is whether there was such an act or omission. The State's claim to indemnification does not depend on some amorphous and boundless contract language.

In that regard, Trinity's focus on the State's "sole negligence" appears to be a reference to the setting of the *Tateosian* case. The underlying claims in that case were based on negligence. The indemnification question was whether the provision applied to the State's sole negligence. The underlying litigation in this case has nothing to do with negligence. The claims in this case were that the DOC, by not providing halal meals, had violated prisoners' rights under the First Amendment or the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc–2000cc-5. Negligence is not the issue.

To the extent that Trinity's point is that the indemnification agreement does not make it liable when the underlying claims arise *solely* due to the State's acts or omissions, that much is plain on the face of the agreement. Trinity has no liability, and is entitled to recoupment, unless the claims arose at least in part due to its acts or omissions. Trinity takes nothing from its reliance upon *Tateosian*.

B. Application to the State's Contract with Trinity

Trinity's position is that the underlying claims arose exclusively due to the State's acts or omissions and had nothing to do with its own acts or omissions. It asserts:

> Trinity [largely through district manager Frank Tracey] advised [Robert Arnell, the DOC's FOM in charge of the religious meals issue] of numerous ways that [the DOC's] religious diet program could come into compliance, noting that many other U.S. facilities had moved to pre-packaged meals to

avoid the difficulty of preparing foods in accordance with religious diets, including the Federal Bureau of Prisons, Massachusetts Department of Corrections, numerous New England counties, and others. [Mr.] Tracey provided three key options that the State could pursue in order to comply with both halal and kosher dietary requirements: (1) the State could serve kosher or halal protein coupled with the remainder of the regular menu, (2) the State could serve pre-packaged kosher or halal meals, or (3) the State could serve inmates following one of these religious diets vegetarian meals with certain food items omitted. As to the second option, Tracey noted that some of these facilities served kosher pre-packaged meals as part of a halal diet. Tracey had no opinion on the appropriateness of each choice, he was only relaying what other states did with similar issues. Tracey was clear in contemporaneous email correspondence: Trinity does not set policies relating to medical and religious diets, they can only make suggestions.

Trinity's Motion for Summary Judgment at 6 (filed June 30, 2023) (citations omitted).

Similarly, in opposition to the State's motion, Trinity says:

Under the DOC's tortured reading of the contract, if Trinity told the DOC that other correctional facilities purchase a certain cooking oil, the State's Purchasing Division elected to purchase that cooking oil, and then a State employee spilled it on the floor, causing someone to slip and sue the State— Trinity would owe defense and indemnity. Under *Tateosian* and its progeny, such a boundless reading cannot stand.

The [underlying] claims did not arise from the act of Mr. Tracey telling Mr. Arnell that other facilities serve kosher pre-packaged meals to Muslim inmates upon consultation with an Imam while noting that Trinity does not set policy on these issues. The Russell claims arose from a policy decision reached by the State following Mr. Arnell's independent research, consultation with the DOC's legal counsel, and consultation with a chaplain—instead of an Imam. To make this decision, the DOC necessarily had to weigh competing policy objectives, balancing the known threat of litigation against the costs of providing religious diets, and also consider the diversity of meals it wished to provide. These types of policy decisions, as Trinity recognized in defining the scope of its services, are the sole prerogative of the State. In sum, this is a case, like *Tateosian*, "where the State [seeks] to impose an ambiguous clause in a form contract that it had drafted" to secure indemnity for its sole negligence.

Trinity's Opposition to Summary Judgment at 12 (filed Aug. 15, 2023).

In other words, Trinity's position is that its only involvement in the eventual decision to serve kosher rather than halal meals to Muslim inmates was that it told the DOC that some prisons do that but that it takes no responsibility for such policy decisions.

Trinity's attempt to write itself and its role out of the narrative is not supported by the record. Its position that it had nothing to do with the DOC's eventual decision to serve kosher meals to Muslim inmates substantially distorts the factual record. There can be no dispute that (1) Trinity had a contractual duty to consult with the DOC on matters related to religious meal requirements, (2) in that capacity, it advised that one way to satisfy halal standards was to provide kosher meals, and (3) it never warned the DOC that doing so was not appropriate or that it disclaimed relevant knowledge or expertise. No doubt, the DOC made the final decision, but it clearly did so with the "benefit" of its consultations with Trinity, whose entire contractual purpose was to provide advice to the DOC on such issues.

The record consists substantially of the deposition transcripts of Mr. Arnell and Mr. Tracey and relevant e-mail chains referred to in those depositions. The record compels the conclusion that (a) Mr. Arnell's role was to determine the DOC's policy, (b) Mr. Arnell conducted his own investigation, (c) in doing so, he consulted with Mr. Tracey and included him in the entire process, (d) Mr. Tracey (and Trinity generally) advised that kosher meal would satisfy halal standards, (e) Mr. Tracey knew that Mr. Arnell was taking that advice and did not plainly warn him not to rely upon it. Simply put, the State paid for consulting, the consulting it got was deficient as to halal meals, and that materially

contributed to the DOC decision that led to the underlying litigation. Trinity's acts and

omissions were "in part" responsible, triggering the indemnity agreement.

The thrust of Mr. Tracey's deposition testimony in that regard is captured in the

following segments:

> Q. Can you tell me in your own words how you interpret this paragraph of
> the contract?
>
> A. If the facility or the health services department has problem or question
> with diet, we'll address that need.
>
> Q. And that includes religious diets, correct?
>
> A. Yes.

Tracey Deposition at 23.

> Q. The next section [of an e-mail from Mr. Arnell including Mr. Tracey] says
> that, it describes facts and says the Kosher meal can be substituted as a Halal
> meal. Did I read that correctly?
>
> A. Yes.
>
> Q. . . . . Other facilities outside the State of Vermont are substituting the
> Kosher meal for the Halal diet. According to Trinity Food Service, it is the
> recommended course of action. Did I read that correctly?
>
> A. Yes.
>
> Q. When he says according to Trinity Food Service, it is the recommended
> course of action, he is referring to you, is he not?
>
> A. Yeah, I wouldn't say recommended course of action. It was a, it was some
> information we had given him and he had looked into it to ensure he wanted
> to go forward with it.

*Id.* at 58.

Q. Okay. So you did attempt to find a provider for Halal pre-packaged meals and you were unable to do so?

A. Correct.

Q. Bob then says [again referring to an e-mail]: We do know Kosher can be substituted as Halal. Right?

A. Yes.

Q. And that came in part from information that you have provided to Bob; correct?

A. Well it's information I had given him.

*Id.* at 62.

Q. So by saying that Trinity does not set policy we can only suggest, what do you mean?

A. The correctional facility, the State, DOCs, would set policy on how they want to handle medical and religious, medical needs that cannot be met with the religious diets.

Q. Okay. But you would provide advice as to how the Department might end up making that decision; correct?

A. Yes.

Q. And it would be reasonable for the Department to rely on the advice that you provided in making that decision; correct?

A. Correct.

*Id.* at 73–74.

Q. At the bottom [of a page of a manual created by Trinity and provided for guidance to the DOC] I'd like to point out a paragraph that is asterisked; tell me if I read this correctly. It says: Note: It is a commonly acceptable practice for Muslim inmates/detainees to accept a Kosher diet in order to meet their religious dietary restrictions. If applicable, this should be stated in the facility's religious policies. Did I read that correctly?

A.  Yes.

Q.  So this manual is advising facility food service managers that it is common for Muslim inmates and acceptable for Muslim inmates to be served Kosher meals?

A.  Yes.

Q.  And this manual is intended for food service managers to rely on in making such decisions; correct?

A.  Yes.

*Id.* at 79–80.  No more is needed to establish the controlling record.

Unlike Trinity's imagined examples, this is not a case where Trinity provided sound advice, the DOC ignored it, and litigation arose as a result.  In that event, it might be clear that the DOC is exclusively responsible for its own bad decision.  Here, however, Trinity was hired to provide this type of advice, it provided that advice, and it participated in Mr. Arnell's decision-making process and eventual decision to take that advice.  It is at least "in part" responsible for that decision and the litigation it prompted.  That is sufficient for the conduct to fall well within the bounds of the Contract's indemnification provision and to render Trinity liable under that provision.

<u>Conclusion</u>

For the foregoing reasons, the State's motion for summary judgment is granted, and Trinity's is denied.

Electronically signed on November 27, 2023, per V.R.E.F. 9(d).


_____
Timothy B. Tomasi
Superior Court Judge