## Department of Corrections v. Matrix Health Systems, P.C.

[950 A.2d 1201]

No. 07-103

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed March 14, 2008

*William H. Sorrell,* Attorney General, and *Bridget C. Asay,* Assistant Attorney General, Montpelier, for Plaintiff-Appellant.

*Thomas Z. Carlson* of *Langrock Sperry & Wool, LLP,* Burlington, for Defendant-Appellee.

¶ 1. **Skoglund, J.** The Department of Corrections (DOC) appeals from the trial court's order granting summary judgment to Matrix Health Systems in this breach-of-contract dispute. The court concluded that the parties' contract imposed no obligation upon Matrix to provide a specific quantity of mental health services at prisons throughout the state as consideration for its monthly fee. The DOC argues that the trial court misinterpreted the terms of the parties' agreement. We conclude that the agreement is ambiguous, and we therefore reverse and remand for additional proceedings.

¶ 2. The record indicates the following. In June 2000, the DOC entered into a two-year contract with Matrix for the provision of "personal services generally on the subject of inmate mental health services." (Emphasis omitted.) Matrix agreed to provide three categories of services, consistent with the service descriptions and the "services provision matrix" set forth in Attachment A of the contract. These obligations included administrative responsibilities, such as employing a Director of Psychiatry to oversee the delivery of services for the entire mental health system, as well as clinical responsibilities, which included the provision of "comprehensive mental health services" at various prisons throughout the state.

¶ 3. As referenced above, Attachment A contained a "services provision matrix," which identified nine state prison facilities and assigned different types of mental health professionals to each facility. The assignments were represented by fractions of "full-time equivalents" (FTE). Thus, for example, the position of "Psychiatry-Supervisor" was assigned .05 FTE at the Northwest State Correctional Facility, and .20 FTE statewide, for a total of .25 FTE. In a similar vein, a "Nurse Practitioner" was assigned to each prison facility in various fractions of FTEs. The matrix reflected nine job categories, including an administrative category.

The contract stated that the scope of services and the staffing matrix represented "specific deliverables" for which Matrix was responsible.

¶ 4. Pursuant to the contract, Matrix agreed to invoice the DOC on the first day of each month for the services provided during the previous month, and Matrix assumed responsibility for ensuring that the services described in Attachment A were delivered. The contract provided that if Matrix failed to deliver the staff resources described in the matrix the DOC would exercise noncompliance penalties. Thus, it stated, if FTE staff resources designated by site and discipline were not provided, the DOC would withhold payment for the staffing deficiency. During the first thirty days that specific staff resources were not provided according to schedule, the contract identified specific hourly rates for each position, which would serve as the basis for deductions from the invoice. These hourly rates doubled during any subsequent month that specific staff resources were not provided according to schedule. In consideration for the services to be provided by Matrix, the DOC agreed to pay Matrix $57,917 per month between June 2000 and May 2001 and $59,365 per month between June 2001 and May 2002.

¶ 5. The contract also included an attachment entitled "Customary State Contract Provisions." This attachment declared, among other things, that the State would not provide any employee benefits, including vacation time and sick leave, for Matrix employees. It also required Matrix to maintain all books, documents, payrolls, papers, accounting records and other evidence pertaining to costs incurred under the agreement and to make them available for inspection.

¶ 6. The parties amended their agreement several times. The first amendment, effective May 31, 2002, extended the contract for another year, and it modified the services provision matrix in Attachment A by changing certain percentages of FTEs assigned to certain prison facilities. The monthly payment amount increased from $59,365 to $65,502 between June 2002 and May 2003. The amendment also included the following statement: "it is hereby agreed and understood that this contract has no minimum amount. The Contractors' services will be required on an 'as needed' basis." The agreement was amended again in December 2002, changing certain FTEs and increasing the payment to Matrix from $65,502 to $74,835.33 per month. The agreement expired on May 31, 2003.

¶ 7. Approximately one year later, the State Auditor released a report, finding that the DOC had failed to "(1) properly manage its private mental health contracts; (2) follow bidding procedures; and (3) provide adequate quality assurance for key mental health care services." The DOC then hired an independent auditor to review the contract at issue here. The auditor assumed that the term "FTE" in the services provision matrix meant forty hours of services per week, and after reviewing Matrix's records, she concluded that Matrix failed to provide approximately 8000 hours of services over the course of the contract. Based on the auditor's findings, the State filed a breach-of-contract action against Matrix.

¶ 8. Matrix moved for summary judgment, arguing that it had not been obligated under the contract to provide any specific level of services; rather, the parties had intended that Matrix would provide a flexible set of services that would be monitored "qualitatively rather than quantitatively." Matrix maintained that the DOC's claim rested entirely on an assumption that 1.0 FTE required 40 hours of service per week, yet this definition was not found anywhere in the contract. According to Matrix, the DOC had invented a contractual obligation, and its audits purported to show only that Matrix failed to comply with this fictional obligation.

¶ 9. The DOC opposed Matrix's motion and filed a cross-motion for summary judgment. Pointing to specific language in the contract, it argued that Matrix had been expressly obligated to provide a set quantity of mental health services, which had been stated as fractions of a full-time-equivalent worker in the services provision matrix. The DOC explained that these services had been identified as "specific deliverables" and that the contract provided for liquidated damages for each hour of services that Matrix failed to provide. The DOC acknowledged that the contract did not define the term "FTE" but argued that the parties plainly intended FTE to mean forty hours of services per week. The DOC thus sought judgment in its favor and an award of damages based on the independent auditor's unchallenged calculations.

¶ 10. After a hearing, the trial court granted summary judgment to Matrix. It concluded that the contract was unambiguous, and that it imposed no obligation on Matrix to provide any specific quantity of services, measured in hours, as consideration for its fee. Instead, the court explained, the contract reflected the parties' intent to create a comprehensive program of mental

health care for inmates through an active, functional, and adaptable relationship. It reasoned that fixing the exact number of hours that employees would be present at each facility would conflict with the goal of providing comprehensive and efficient services, and adapting the program to those needs on an ongoing basis in a collaborative fashion. Given this, the court concluded, the FTE matrix could be interpreted only as a planning tool for estimating clinical needs. The court was unpersuaded that the contract's specific penalty provisions changed this result. It thus granted summary judgment to Matrix. This appeal followed.

¶ 11. We review the trial court's decision using the same standard as the trial court: "[s]ummary judgment is appropriate only where the depositions, pleadings, interrogatory answers, admissions and affidavits on file show that no genuine issue of material fact exists and 'any party is entitled to a judgment as a matter of law.'" *Mellin v. Flood Brook Union Sch. Dist.*, 173 Vt. 202, 211, 790 A.2d 408, 417 (2001) (quoting V.R.C.P. 56(c)(3)). We similarly review the trial court's interpretation of the parties' contract de novo. See *John A. Russell Corp. v. Bohlig*, 170 Vt. 12, 16, 739 A.2d 1212, 1216 (1999) (question of whether contract is ambiguous presents question of law, as does interpretation of unambiguous contract). As discussed below, we conclude that the parties' agreement is ambiguous, and thus, its proper interpretation presents a question of fact, not law. See *id.* (when ambiguity exists, interpretation of contract becomes question of fact to be decided by a factfinder). Because a material fact remains in dispute, summary judgment was inappropriate.

■ ■ ¶ 12. In construing a contract, the court seeks to implement the parties' intent. *In re Verderber*, 173 Vt. 612, 615, 795 A.2d 1157, 1161 (2002) (mem.). In doing so, we must consider the contract "as a whole and give effect to every part contained therein to arrive at a consistent, harmonious meaning, if possible." *Main St. Landing, LLC v. Lake St. Ass'n*, 2006 VT 13, ¶ 7, 179 Vt. 583, 892 A.2d 931 (mem.). "[W]hen the language of the contract is clear on its face, we will assume that the intent of the parties is embedded in its terms." *Verderber*, 173 Vt. at 615, 795 A.2d at 1161. An ambiguity exists, however, when "a writing in and of itself supports a different interpretation from that which appears when it is read in light of the surrounding circumstances, and both interpretations are reasonable." *Isbrandtsen v. N. Branch Corp.*, 150 Vt. 575, 579, 556 A.2d 81, 84 (1988). As noted

above, if an ambiguity exists, the question of what the parties intended becomes a question of fact for the factfinder to resolve. *Bohlig*, 170 Vt. at 16, 739 A.2d at 1216.

¶ 13. In this case, we cannot determine, as a matter of law, if the parties intended that Matrix would be required to provide a specific level of services as consideration for its monthly fee, or whether the arrangement was essentially a "retainer" agreement, as Matrix argued. Clearly, the agreement reflects an intent to create a "collaborative" and comprehensive mental health program at state prison facilities. As the trial court noted, the parties agreed to communicate regularly and consistently to discuss "general system concerns and specific issues" that might arise during the term of the contract. The DOC also had the right to cancel the contract on short notice. Moreover, as the court pointed out, Matrix was charged with delivering services consistent with both the more generally stated "service descriptions" found in Attachment A as well as the "services provision matrix."

¶ 14. Yet while these provisions might lend support to Matrix's position, the contract also includes very specific provisions that support the DOC's interpretation of the agreement. As reflected above, Matrix expressly agreed to provide services consistent with the staffing matrix, and it agreed that the scope of services and the staffing matrix represented specific deliverables for which it was responsible. Matrix also agreed to provide the DOC with an invoice each month for the services that were provided, and the parties agreed that DOC was entitled to deductions from this invoice based on hourly rates for specific staff resources that were not provided according to schedule. Moreover, the parties recognized that their agreement had "no minimum" and that Matrix's services were provided on an "as needed" basis. These provisions certainly tend to militate against a finding that Matrix's performance would be measured solely on a "qualitative" basis and that Matrix would be entitled to a flat monthly fee regardless of the level of services it provided. Because the measure of Matrix's performance is subject to more than one reasonable interpretation, it was not appropriate for resolution on summary judgment. *Toys, Inc. v. F.M. Burlington Co.*, 155 Vt. 44, 52, 582 A.2d 123, 127 (1990).

¶ 15. We similarly cannot discern exactly how the penalty provisions were intended to operate, or what the parties intended

by the term "FTE." Were the penalties to be implemented only when a mental-health position remained vacant, as Matrix asserts, or was the DOC entitled to a deduction for each hour of services (or fraction thereof) that were not provided in accordance with the services provision matrix? The plain language of the agreement does not offer a definitive answer. Additionally, while the State's interpretation of the term "FTE" to mean forty hours of services per week is certainly reasonable, we cannot say, as a matter of law, that it is the only reasonable interpretation of this term. See *Trs. of Net Realty Holding Trust v. AVCO Fin. Servs. of Barre, Inc.*, 144 Vt. 243, 248, 476 A.2d 530, 533 (1984) ("A provision in a contract is ambiguous only to the extent that reasonable people could differ as to its interpretation."). The fact that employees of Matrix would not be treated as state employees, and thus, would not be paid by the State for vacation or sick time, does not lead to the inevitable conclusion that the parties intended the term "FTE" to mean a forty-hour week.

■ ¶ 16. We are unpersuaded that the extrinsic evidence offered by Matrix clarifies these ambiguities. As the DOC points out, this evidence is disputed, with one of the signatories taking a directly contrary position to that proffered by Matrix. It remains for a factfinder to resolve such conflicts and to determine the parties' intent "based on all of the evidence — not only the language of the written instrument, but also evidence concerning its subject matter, its purpose at the time it was executed, and the situations of the parties." *Main St. Landing*, 2006 VT 13, ¶ 7. Summary judgment was granted in error, and we therefore reverse and remand for additional proceedings.

*Reversed and remanded.*