2013 VT 119

## State of Vermont v. Prison Health Services, Inc.

[88 A.3d 414]

No. 12-380

Present: **Dooley, Skoglund, Burgess and Robinson, JJ., and Devine, Supr. J., Specially Assigned**

Opinion Filed December 20, 2013

*William H. Sorrell*, Attorney General, and *Mark J. Patane*, Assistant Attorney General, Montpelier, for Plaintiff-Appellant.

*Samuel Hoar* and *Sophie E. Zdatny* of *Dinse, Knapp & McAndrew, P.C.*, Burlington, for Defendant-Appellee.

*Shannon A. Bertrand* of *Kenlan, Schwiebert, Facey & Goss, P.C.*, Rutland, for Intervenor-Appellee James Gipe, Administrator of the Estate of Ashley Ellis.

¶ 1. **Skoglund, J.** The case before us involves a contract dispute between the State of Vermont and Corizon Health, Inc., formerly known as Prison Health Services, Inc. (PHS). The State appeals a declaratory judgment ruling that PHS is not contractually obligated to defend the State and its employees against certain claims brought by the estate of decedent, who died while in the custody of the Department of Corrections. We reverse, and conclude that PHS has a duty to defend.

¶ 2. In January 2007, PHS entered into a twenty-four million dollar contract with the State to provide all medical services to inmates in the custody of the Department in compliance with all laws and national health care standards. In addition to outlining the specific terms of the service agreement, the contract contained an indemnification provision requiring PHS to "indemnify, defend and hold harmless the State and its officers and employees from liability and any claims, suits, judgments, and damages which arise as a result of [PHS]'s acts and/or omissions in the perfor-

mance of services under this contract." The question presented is whether, under this contractual language, PHS is obligated to defend the State and its employees for certain claims in a lawsuit brought by decedent's estate.

¶ 3. ■■ ■■ In contractual duty-to-defend cases, "an indemnitor's obligation to defend should be determined at the beginning of the case based on the pleadings." *Tateosian v. State*, 2007 VT 136, ¶ 15, 183 Vt. 57, 945 A.2d 833. For a judgment on the pleadings, we assume all factual allegations in the nonmoving party's pleadings are true. *Knight v. Rower*, 170 Vt. 96, 98, 742 A.2d 1237, 1239 (1999).

¶ 4. The events on which the pleadings are based are as follows. On August 14, 2009, decedent began serving a thirty-day sentence at the Northwest State Correctional Facility in Swanton, Vermont. At the time of her incarceration, decedent suffered from an eating disorder and weighed only ninety pounds. As a result of her eating disorder, decedent also suffered from hypokalemia, a life-threatening condition linked to dangerously low potassium levels. When she entered the prison, decedent was taking a potassium supplement called K-Clor to treat the hypokalemia. The facility was given notice of decedent's medication needs prior to her admission.

¶ 5. On the day decedent entered the facility, PHS was short-staffed. The facility had no potassium supplement in stock, and none was obtained during decedent's incarceration. On the morning of August 16, 2009, two days after entering the correctional facility, decedent was found nonresponsive in her cell by correctional officers. Neither PHS nor the correctional officers were able to locate a cardiopulmonary-resuscitation (CPR) mouth guard, delaying resuscitation attempts. Decedent was taken to Northwestern Medical Center, where she was pronounced dead. The medical examiner found that she died from a hypokalemic-induced cardiac arrhythmia resulting from a lack of potassium.

¶ 6. Decedent's estate, through its administrator James Gipe, made claims against both PHS and the State. PHS privately settled with the administrator before any lawsuit was filed. Part of the terms of the settlement included a Covenant Not to Sue, in which the administrator agreed not to bring any claims against PHS, including any claims against the State for which PHS could owe a duty of defense or indemnification.

¶ 7. In July 2011, the administrator filed a lawsuit against the State and several state employees in Rutland Superior Court. See *Gipe v. State*, Docket No. 515-7-11 Rdcv. In an amended complaint, the administrator strategically tailored the estate's claims to remove PHS actors from the suit, at least nominally, alleging five different causes of action: (1) cruel and unusual punishment; (2) intentional infliction of emotional distress; (3) negligence; (4) punitive damages; and (5) wrongful death. Only four of these claims are at issue here; the State concedes that PHS is not obligated to defend it against allegations of taunting by corrections officers that make up the estate's claim for intentional infliction of emotional distress and part of the cruel and unusual punishment claim.

¶ 8. The State filed a declaratory judgment action, seeking a declaration that PHS has a duty to defend the State against the claims asserted in *Gipe v. State*. It attached a copy of the contract between the State and PHS, a copy of the original complaint in *Gipe v. State*, and a copy of the subsequently amended complaint. After hearing arguments, the trial court granted PHS judgment on the pleadings sua sponte, finding that "[t]here are no allegations of wrongdoing by PHS personnel that form the basis for a claim, and thus the duty to defend is not triggered." On that basis, the court held that the State failed to meet its burden of showing that PHS had an obligation to defend based on the terms of the contract. On appeal, the State continues to argue that PHS has a duty to defend the State and its employees against the estate's claims, insofar as the claims are not based on the sole actions of the State.[1]

¶ 9. ▮ Whether PHS has a duty to defend the State in the matter of *Gipe v. State* is a question of law, which we review de novo. See *Tateosian*, 2007 VT 136, ¶ 10; see also *Dep't of Corr. v. Matrix Health Sys., P.C.*, 2008 VT 32, ¶¶ 11-12, 183 Vt. 348, 950 A.2d 1201 (explaining that our review of the trial court's interpretation of the parties' contract is nondeferential). We have held that insurance law principles, which would resolve all contractual ambiguities in favor of the insured, do not completely apply in

---

[1] The State asks for a ruling only on the issue of whether PHS is obligated to defend the State against the estate and not on the issue of indemnification, which it states "is not yet ripe for determination."

cases involving a noninsurance contractual indemnity relationship.[2] See *Tateosian*, 2007 VT 136, ¶ 15. Rather, we interpret the indemnification provision of the contract to give effect to the intent of the parties as it is expressed in their writing. *Hamelin v. Simpson Paper Co.*, 167 Vt. 17, 19, 702 A.2d 86, 88 (1997). When the contract language is unambiguous, the intent of the parties is rooted in the words of the document, where the plain meaning of the language governs its interpretation. *Southwick*, 2011 VT 53, ¶ 4. "We assume that parties included contract provisions for a reason, and we will not embrace a construction of a contract that would render a provision meaningless." *Id.* (quotation omitted). In short, we will enforce the contract as written.

¶ 10. Here, the contract's indemnification provision stated that PHS would "indemnify, defend and hold harmless the State and its officers and employees from liability and any claims, suits, judgments, and damages which arise as a result of [PHS]'s acts and/or omissions in the performance of services under this contract." The contract further stated that this provision

> is intended by the parties to include (i) defense of all claims, and/or lawsuits, including but not limited to actions for damages and/or for declaratory or injunctive relief, to the extent that they contain allegations that arise as a result of [PHS's] negligence in the performance

[2] In *Tateosian*, we noted that other jurisdictions have concluded that obligations assumed through contractual indemnity differ from those an insurance company agrees to provide. *Tateosian*, 2007 VT 136, ¶ 13. As an example, we cited the situation where "noninsurance indemnity agreements should be construed against the indemnitee because subcontractors who indemnify general contractors occupy an inferior bargaining position." *Id.* We have, however, departed from this rule where the agreement is the result of an arm's-length deal and the facts suggest no true disparity in bargaining power. See *Southwick v. City of Rutland*, 2011 VT 53, ¶¶ 12, 14, 190 Vt. 106, 35 A.3d 113. As between the State and PHS, we have no doubt that both parties possess strong business acumen and have commensurate resources on hand, leveling the playing field of contract negotiation. PHS was able to negotiate a twenty-four million dollar contract with the State. The contract was further amended several times to increase the maximum payable amount in favor of PHS. This is suggestive of equal bargaining power among the parties. Even if we were to construe the contract against the drafter, there is disagreement as to the identity of the drafter. PHS claims it is the State, while the State rebuts that there is no evidence in the record to confirm this and proclaims it "highly unlikely that the State's counsel was responsible for this language." We need not delve further into this inquiry, however, as we see no true disparity in bargaining power between the State and PHS.

of services under this contract and/or intentional misconduct in the performance of services under this contract (intentional conduct to include, without limitation, any intentional violation of law or duty of care to any inmate) whether or not [PHS], an employee of [PHS], or a subcontractor of [PHS] is a named party to the action . . . . The parties do not intend [the indemnification provision] to include liability or defense for any allegations that arise as a result of the acts (including intentional misconduct), omissions, policies, or procedures or any other conduct attributable to the State, its agents, officers or employees.

The contract plainly states here that both parties intended for PHS to defend the State against claims where such claims "contain allegations that arise as a result of [PHS's] negligence" in the performance of the medical services specified in the contract. The issue, then, is not the plainness of the language, but "whether the allegations in the original complaint were claims that arose out of [the contractor's] performance of the contract." *Tateosian*, 2007 VT 136, ¶ 16.

¶ 11. ▇ Before we turn to the claims themselves, however, we address PHS's argument as to how the indemnity clause should be interpreted. PHS contends that because the contract does not expressly state. that PHS will defend "acts . . .· omissions, policies or procedures or any other conduct" *solely* attributable to the State, PHS should not be required to defend against any independent conduct of State employees "regardless of whether [PHS] may separately have contributed to the alleged harm or injury." We disagree with this reasoning. The contract clearly outlines the possibility of a case where PHS would be required to defend the State against claims arising from PHS's negligence "whether or not . . . [it] is a named party to the action." If PHS was correct in its interpretation of the contract, and could not be required to defend the State against any action involving both PHS and State actors, we have trouble envisioning a situation where this phrase would apply. Rather, the presence of this "whether or not" clause is a persuasive indication that both parties intended for PHS to defend the State against claims involving negligence by both parties, to the extent that they arise as a result of PHS's negligence in its performance of contracted services.

¶ 12. Having determined that the contractual language does not excuse PHS from its duty to defend the State, we address the critical question of whether the estate's allegations against the State arise from PHS's performance of the contract. In so looking, we focus on the "factual allegations in [the] complaint and not on the legal theories asserted." *TBH v. Meyer*, 168 Vt. 149, 153, 716 A.2d 31, 35 (1998). As such, we address the facts set forth in the complaint against the State, which are "re-state[d] and re-incorporate[d]" into each of the four claims relevant to this case.[3] Taking these factual allegations as true, *Goodby v. Vetpharm, Inc.*, 2009 VT 52, ¶ 3, 186 Vt. 63, 974 A.2d 1269, we conclude that the estate's grievances arise from negligent conduct by both the State and PHS in its performance of contracted services. Thus, we hold that PHS has a duty to defend the State against these claims.

¶ 13. Among the facts that the estate alleges in the amended complaint are the following: (1) "the facility did not have K-Clor in stock and the staff did not obtain it during her incarceration"; (2) the State "did not have adequate procedures for obtaining out of stock medications"; (3) "neither [PHS] nor the correctional officers were able to locate a CPR mouth guard" causing a delay in resuscitation efforts; (4) the State "failed to ensure that procedures were in place to deliver promised information and communications with medical staff"; and (5) the State was aware of and contributed to short-staffing at the facility.

¶ 14. Addressing each fact in turn, we begin with the assertion that the facility did not have any K-Clor in stock and did not obtain it or administer it to decedent during her incarceration. As one of the specific roles outlined in the contract, PHS was to conduct all initial medical screening of inmates, whereby PHS staff were to ascertain any "illnesses, health conditions, and special requirements" of an inmate, including any currently pre-scribed medications. Any such medications were to be "made available to the inmate in accordance with established protocols." The establishment of said protocols were in turn part of PHS's contractual obligations regarding pharmaceuticals. This section of

---

[3] PHS offers a refreshingly honest argument for denying the State's request for defense. "Throughout the proceedings below, [PHS] sought to obtain a ruling from the trial court that the Estate had successfully pled *around* the release language contained in the Covenant Not to Sue because the Estate's allegations were specifically directed at actions or omissions taken by the State's employees . . . ." (Emphasis added.)

the contract particularly mandated that PHS "provide a total pharmaceutical system in compliance with [national] standards that is sufficient to meet the needs of the DOC inmates. [PHS] shall also be responsible for *the acquisition, storage and administration of pharmaceuticals.*" (Emphasis added.) The contract plainly indicates that one of the contractual services PHS was obligated to provide was identifying an inmate's need for medication and acquiring the necessary pharmaceuticals. As such, PHS is implicated in whatever negligence led to decedent's failure to receive the potassium supplement she needed.

¶ 15. The second fact, that the State did not have adequate procedures for obtaining out-of-stock medication, also falls directly under the purview of PHS's contracted services. As one prong of the "total pharmaceutical system" PHS was contracted to create, the contract stipulates that there be a medical administration program that "shall contain internal controls for reorder [of pharmaceuticals] . . . . The system must ensure the provision of continuous pharmaceutical therapy." This contractual directive clearly assigned PHS the task of creating and managing an organizational system for the stocking and reordering of medication for inmates. The responsibility for a critical failure of such a system must, therefore, also be assigned to PHS — at least in so much as any other party is responsible. PHS thus fails in its claim that it bears no responsibility when decedent failed to receive necessary continuous pharmaceutical therapy. Where a contract so directly lays out the requirement that a contractor create and maintain a system of responsible services and the system experiences a total shutdown, the contractor is implicated in the resulting action.

¶ 16. Likewise, when the estate asserts that both PHS and the State failed to locate a CPR mouth guard, delaying efforts to resuscitate decedent, PHS is most certainly implicated. PHS is not only actually named here, but was also contractually obligated to provide an immediate response to decedent's medical emergency. The contract's "emergency services" provision explicitly stated that "[PHS] is required to provide an immediate response to inmates in an emergency situation" and to have "specific written policies and procedures to address emergency response." An emergency measure so basic as having a CPR mouth guard readily available certainly falls under the broad cover of this language. The subsequent failure of such a measure and the delay

to decedent in receiving immediate emergency care is thus inescapably a failure of the emergency services PHS was plainly contracted to provide, regardless of whether the State was also negligent.

¶ 17. The estate further asserts that the State failed to ensure that procedures were in place to deliver promised medical information and communicate with PHS staff regarding the critical care decedent needed. Again, under the contract, PHS was responsible for providing the very services the estate declares were absent. Specifically, the contract mandated that "[r]egular channels of communication . . . be established and maintained between [PHS]'s health care staff and the Facility Superintendent and facility staff to ensure a continuum of care for sick inmates," including inmates like decedent who are "seriously ill with significant health conditions." Though the State may be responsible for its fair share of the multiple communications failures that occurred regarding decedent's condition and her urgent need for medication, it cannot be denied that communicating with State employees about inmates with health concerns was a contractual duty for which PHS was responsible. The estate's facts include that decedent "went through intake procedures during which time she identified her health as an area of concern." Since PHS was contracted to conduct health screenings of all new inmates immediately upon intake, a logical conclusion is that PHS staff took part in admission procedures where decedent's health issues were noted. Further, communicating with facility staff on medical issues was a contractual obligation. Thus, any communication failure regarding decedent's condition is necessarily shared by PHS and the State.

¶ 18. Finally, in its complaint, the estate heavily emphasizes that the State was aware of short-staffing issues and contributed to the problem on the day of decedent's death by requiring a PHS employee to attend a meeting outside the facility. Yet we find in the contract that as part of PHS's "performance guarantees" it "shall be [PHS's] final responsibility to fill all posts in accordance with the staffing standards and coverage schedules" and that PHS "must also ensure that no shift is left uncovered." It was, thus, PHS's responsibility — at least in part — to ensure that the facility was adequately staffed. This is enough to find that the allegations regarding short-staffing arose as part of PHS's actions or inactions.

¶ 19. We could go on through each of the factual allegations that make up the foundation of the estate's claims against the State to find contractual support for holding that these allegations arise, at least partially, from PHS's performance of contracted services. We need not continue, however. Assuming the factual allegations in the complaint to be true, it is clear that PHS's performance cannot be excluded from contributing to the unfortunate set of circumstances which led to decedent's untimely death.

¶ 20. Even the court below, despite ruling for PHS, acknowledged that "[t]here is no question that some acts of PHS personnel are described in the complaint, and are part of the context of the alleged acts." Nonetheless, the trial court held that "the acts of wrongdoing identified as the grounds for each of the causes of action are the acts of the state actor defendants, and not those of PHS personnel. There are no allegations of wrongdoing by PHS personnel that form the basis for a claim." As evidenced by our discussion of the facts alleged by the estate, we respectfully disagree with the trial court on this point. The claims asserted by the estate implicate both the State and PHS in what occurred, both factually and under the terms of the contract. We note that the complaint as originally filed alleged that PHS was also provided with decedent's medical records prior to her incarceration, and that a doctor for PHS confirmed that she should receive her medications while incarcerated. The original complaint further declared that "[n]either the health care provider nor the correctional facility staff had an adequate procedure for obtaining out of stock medications."

¶ 21. ■ While the amended complaint apparently tried to eliminate allegations directed against PHS, the claims made all focus on the medical services provided for decedent, thus relating to services PHS was contractually obligated to provide, and necessarily implicating PHS in the conduct surrounding decedent's death. Removing specific allegations against PHS from the amended complaint does not relieve its contractual obligation to defend the State in this matter. The estate's claims contain allegations that arise as a result of PHS's provision of medical services to inmates, and it must therefore defend the State against these claims.

¶ 22. The scope of our inquiry here is limited to whether PHS has an obligation to defend the State based on the language of the

contract's indemnity clause. Having established that many of the key facts on which the estate's claims are based can be traced back to implicate PHS through its conduct and contractual obligations, we are satisfied that the State has shown that the indemnity clause applies. We therefore reverse the trial court's decision and conclude that PHS does have a duty to defend the State against these claims.[4] Because we hold as such, we need not reach the State's argument that the trial court erred by granting judgment sua sponte to PHS. Likewise, we do not address PHS's argument that the Covenant Not to Sue executed between PHS and the estate fulfills PHS's duty to defend. As the State points out, it is not a party to that agreement, and therefore the agreement is not part of the case before us.

*Reversed.*

---

[4] We do not foreclose decedent's estate from making additional amendments to the complaint to more specifically allege independent wrongful conduct by the State without implicating the acts or services provided by PHS.