2014 VT 51

# Kneebinding, Inc. v. Richard Howell

[99 A.3d 612]

No. 13-004

Present: Reiber, C.J., Dooley, Skoglund and Robinson, JJ., and Toor, Supr. J., Specially Assigned

Opinion Filed May 23, 2014

*Peter G. Anderson*, Stowe, for Plaintiff-Appellee.

*Caroline S. Earle* of *Ellis Boxer & Blake PLLC*, Montpelier, for Defendant-Appellant.

¶ 1. **Dooley, J.** Richard Howell, defendant in this commercial contract and employment dispute, appeals from a judgment in favor of plaintiff Kneebinding, Inc. on his counterclaims alleging breach of contract, tortious interference with contract, defamation, trademark violation, and misappropriation of trade secrets. Howell contends the trial court erred in concluding that: (1) a contractual release barred the counterclaims arising prior to the date of the release, and (2) the release was supported by sufficient consideration. We affirm.

¶ 2. Except where otherwise noted, the material facts are not in dispute. In 2006, Howell formed Kneebinding, Inc. to develop a ski binding based on a new release mechanism that he had invented. John Springer-Miller provided major financing and received a controlling interest in the corporation. Pursuant to a series of agreements, John Springer-Miller became the chairman of the board of directors and Howell was employed as president and chief executive officer. An employment agreement executed by the parties in November 2007 provided that Howell would be an at-will employee with an annual base-salary of $80,000 per year, and, in the event his employment was terminated "other than for Cause," Howell would receive $80,000 as severance compensation payable in equal installments over a period of one year.

¶ 3. Less than a year later, in September 2008, the company's board of directors voted to terminate Howell's employment without cause. Negotiations between the company and Howell over the terms of his departure resulted in a letter from John Springer-Miller on behalf of Kneebinding to Howell, dated October 2, 2008, confirming "the terms and conditions of [Howell's] severance arrangement with Kneebinding, Inc. ('the Company')." The provisions of the letter and certain attachments thereto form the basis of the instant dispute. As originally presented to Howell, the material provisions of the letter agreement were as follows. The

first and second unnumbered[1] paragraphs of the agreement provided, in pertinent part:

> The Company will provide you [Howell] with the benefits described herein if you sign and return this letter agreement and the Consulting Agreement attached hereto as Attachment A to me by October 9, 2008, and agree to timely sign and return the Release of Claims attached hereto as Attachment B within five calendar days following the end of the Consulting Period (as defined in the Consulting Agreement).

> By signing and returning this letter agreement (including Attachment A), you will be agreeing to the terms and conditions set forth in such agreements.

The substance of the agreement is in paragraph two and the following sections of the agreement. Paragraph two provides:

> Subject to your compliance with the terms of this Agreement . . . :

>> (a) In accordance with Section 5 of your Employment Agreement dated November 1, 2007 . . . the Company will pay you severance in the form of continuation of your base salary (equivalent to $80,000) (the "Severance Pay"), less applicable taxes and withholdings, *provided*, however, that the Company shall deduct from the Severance Pay the sum of $18,000 pursuant to Paragraph 2(b)(i) below. The Company shall pay the remaining Severance Pay (*i.e.* $62,000) in equal semi-monthly installments of $2,583.33, less applicable withholdings.

>> (b) *Severance Benefits*: Provided you timely sign and return this letter agreement and the Release of Claims at Attachment B after the end of the Consulting Period (as defined in Attachment A):

---

[1] The first two paragraphs of the letter are unnumbered. The third paragraph is also unnumbered, but is the introduction to the eighteen numbered paragraphs that follow.

i. The Company agrees to sell you, and you agree to purchase, the Volkswagen . . . vehicle you used in connection with your employment with the Company . . . for a price of $18,000 (the "Car Price"). You agree that the Company may deduct the Car Price from the Severance Pay in accordance with Paragraph 2(a) above. . . .

ii. The Company agrees to engage you as a Consultant for a period of six months pursuant to the terms and conditions set forth in the Consulting Agreement attached to this letter as Attachment A.

Finally, as directly relevant here, the agreement provided in paragraph three as follows:

3. *Release*: — In consideration of the agreements and promises described in Paragraph 2(b), which you acknowledge you would not otherwise be entitled to receive, you hereby fully, forever, irrevocably and unconditionally release, remise and discharge the Company, its officers, directors, attorneys, affiliates, investors, agents and employees (each in their individual and corporate capacities) . . . from any and all claims . . . of every kind and nature that you have ever had or now have against the Released Parties, including, but not limited to, any and all claims arising out of or relating to your employment with and/or separation from the Company . . . .

There then followed an exhaustive list of claims which Howell agreed to release, "including, but not limited to," employment discrimination under federal and state law and tort and contract claims of every sort, subject to several exceptions, including Howell's rights under the parties' Voting Agreement and Investors' Rights Agreement.

¶ 4. The Consulting Agreement referenced in the agreement (Attachment A) provided for a six-month period of consulting services from Howell, for a fee of $1,050 per month plus $350 per day for every day of services in excess of three per month. The Release of Claims (Attachment B) tracked verbatim the broad release provisions set forth in paragraph three of the agreement.

¶ 5. Howell failed to immediately sign either the letter agreement or Consulting Agreement, but sought instead to renegotiate some of the severance terms, ultimately without success. Kneebinding in the meantime had continued to maintain the insurance and registration on Howell's company car and had permitted him continued use of the vehicle. In December 2008, however, the company informed Howell that the insurance and registration on the vehicle were expiring and that it planned to take repossession absent a signed agreement. Howell, in response, met with Springer-Miller later that month. The parties thereupon made several handwritten changes to the letter agreement and the Consulting Agreement and signed both. The revisions to the letter agreement were minor: the dates set forth in the first and last paragraphs were changed from October 9, 2008 to December 30, 2008, and the make of the company car described in Paragraph 2(b)(i) was changed from Volkswagen to Saab.

¶ 6. The parties' revisions to the Consulting Agreement were more significant. They deleted Howell's previously guaranteed consulting fee of $1050 per month for six months, leaving only a discretionary provision for payment of $350 per day for any services he performed between December 30, 2008 and June 30, 2009. The company ultimately did not engage Howell for any consulting services during this period,[2] and Howell never signed the separate release set forth in Attachment B at the end of the designated consulting period.

¶ 7. Shortly after the revised agreement was signed, in early January 2009, Kneebinding sent a check and memo to Howell indicating that it was for his accrued "salary" of $18,083.31 for the preceding seven pay periods (based on an annual rate of $62,000 commencing from the date of his termination in mid-September 2008), plus $18,000 for "vehicle," minus deductions for taxes and child support and $18,000 for "vehicle purchase."[3] Howell received a bill of sale and title to the company car the same month. Additional severance checks were sent to Howell through mid-September 2009.

¶ 8. In March 2009, Kneebinding filed a lawsuit against Howell alleging that he had violated certain nondisparagement and non-

---

[2] It is unclear whether the absence of any consulting work was the result of a decision by the company, by Howell or by both.

[3] The salary of $18,083.31 was based on seven installment payments of $2,583.33, as provided in the parties' agreement.

compete provisions of their agreements, committed trademark violations and defamation, tortiously interfered with contracts between Kneebinding and its customers and distributors, and misappropriated trade secrets. Howell answered and counterclaimed, alleging counts for breach of contract, defamation, invasion of privacy, misappropriation, unfair competition, tortious interference with business relations, patent violations, and intentional infliction of emotional distress.[4]

¶ 9. Kneebinding thereafter moved for summary judgment on Howell's counterclaims, asserting that they were barred by the release set forth in paragraph three of the signed letter agreement. In a written decision filed in September 2012, the trial court granted the motion with respect to all of the counterclaims that arose prior to the execution of the release on December 30, 2008, and denied the motion as to those claims that arose after the release.[5] Howell then moved for reconsideration or, alternatively, permission to take an interlocutory appeal. The trial court denied the motion for reconsideration, but granted the request for interlocutory appeal. We accepted review.

¶ 10. Howell asserts that, in granting summary judgment on the counterclaims, the trial court erred in finding a valid release because he never signed the separate release of claims set forth in Attachment B to the letter agreement. In reviewing a summary judgment, we employ the same standards as the trial court. "[S]ummary judgment is appropriate only when the record clearly shows that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." *Madowitz v. Woods at Killington Owners' Ass'n*, 2010 VT 37, ¶ 9, 188 Vt. 197, 6 A.3d 1117 (quotation omitted). We review "the trial court's interpretation of the parties' contract de novo." *Dep't of Corr. v. Matrix Health Sys., P.C.*, 2008 VT 32, ¶ 11, 183 Vt. 348, 950 A.2d 1201. Our paramount goal in interpreting a contract is "to give

---

[4] Howell also filed third-party claims against the Springer-Millers and their wholly owned company, ACL Investments, LLC. These claims are not before us.

[5] Those counterclaims which the court found had arisen after the date of release, and were therefore not barred, were counts three, four, and five involving the alleged misappropriation of Howell's name and skills, and portions of count two (defamation), count seven (intellectual property), and count eight (intentional infliction of emotional distress). In addition, the court ruled that count one for breach of contract fell within the exception in the release provision for claims arising under the Voting Agreement and Investors' Rights Agreements.

effect to the parties' intent, which we presume is reflected in the contract's language when [it] is clear." *In re Adelphia Bus. Solutions of Vt., Inc.*, 2004 VT 82, ¶ 7, 177 Vt. 136, 861 A.2d 1078. In so doing, we strive to "give effect to every part of the instrument and form a harmonious whole from the parts." *In re Verderber*, 173 Vt. 612, 615, 795 A.2d 1157, 1161 (2002) (mem.).

¶ 11. The parties presented two different theories on the meaning of the documents. For Howell, the critical language is in the opening phrase of paragraph three of the letter agreement, the paragraph headed *"Release."* The phrase states "in consideration of the agreements and promises described in Paragraph 2(b), which you acknowledge you would not otherwise be entitled to receive." Howell argues that the language is significant and controlling because paragraph two, subsection (b) defines his *"Severance Benefits,"* again with an opening proviso: "Provided you timely sign and return this letter agreement and the Release of Claims at Attachment B after the end of the Consulting Period (as defined in Attachment A)" and goes on to describe the severance benefits of the car purchase and the consulting agreement. Howell argues that, when considered together, paragraphs two and three mean that the release in paragraph three is effective only when Howell signed the Appendix B release. Since Howell never signed the Appendix B release, he argues that the paragraph three release never went into effect.

¶ 12. The company argues that the purpose of the two release provisions — one in Appendix B and one in paragraph three — can be explained only by concluding that the Appendix B language is intended to include any claims arising during the consultation period. It argues that this purpose is clear from the preamble of the letter agreement providing that the company is providing the benefits only if Howell signs the letter agreement and "agree[s] to timely sign and return the Release of Claims attached hereto as Attachment B within five calendar days following the end of the Consulting Period." Kneebinding points out that the effect of Howell's argument is that paragraph three is superfluous, without having any effect in any circumstance.

¶ 13. The trial court accepted the company's argument and concluded that the parties' agreement was clear and unambiguously released Kneebinding from liability pursuant to the release provision set forth in paragraph three of the agreement, even without Howell's signature on the separate Release of Claims set

forth in Attachment B. As the trial court observed, "[t]here is no suggestion that the release in the termination [agreement] itself . . . would be affected by [Howell's] failure to later sign the 'Release of Claims,'" which he merely "agreed" to sign at a later date following the consulting period. The essential contractual quid pro quo — the $18,000 advance allowing Howell to purchase the company car in return for the release in paragraph three of the agreement — operated independently of the consultancy agreement and release in Attachment B. The only tangible effect of Howell's failure to sign the separate release at the end of the consulting period, as the trial court observed, was "that the claims released are claims from December 30, 2008 [the date of execution of the agreement] and earlier rather than claims from the end of the Consulting Period [June 30, 2009] and earlier."

¶ 14. The court amplified its holding in response to the motion to reconsider. It explained:

> The requirement that Mr. Howell sign and return the "letter agreement" applied to the benefit in Paragraph 2(b)(i). (The automobile). The requirement that he sign and return the "Release of Claims" after the end of the Consulting Period applied to the benefit in Paragraph 2(b)(ii). (The consulting period). This is the way the parties themselves interpreted Paragraph 2(b). Indeed, if the requirement that Mr. Howell sign the "Release of Claims" applied to paragraph 2(b)(i), then the purchase and sale of the Saab in January 2009 was premature, since at that time the six-month Consulting Period had only just begun, and Mr. Howell had not signed the "release of Claims" nor was he required to. Similarly, the "Release of Claims" plainly applied to Paragraph 2(b)(ii), both in terms of subject matter (the consultancy) and logic. Since there was already a release in Paragraph 3 of the severance agreement, the only purpose that the largely identical "Release of Claims" could possibly serve would be to release claims that arose between Mr. Howell's termination and the end of the Consulting Period. In short, the "Release of Claims" has nothing to

do with the operation of the release in Paragraph 3 of the severance agreement.[6]

¶ 15. ■■ We agree with the court's analysis that the relevant contractual language is unambiguous and supports the company's position. The language of paragraphs three and paragraph two, subsection (b) do not explicitly state that paragraph three comes into effect only if the release of claims is signed. Instead, we read it to say only that the consideration for the detriment to Howell caused by the release in paragraph three is the benefits to him in paragraph two, subsection (b). The logic of Howell's construction is perverse because it conditions the applicability of a detriment to Howell, the paragraph three release, on his incurring another detriment by signing the release of claims in Appendix B. Under that construction, the acceptance of either release is optional with Howell, an option not surprisingly he declined to invoke. As the company also argues, Howell's construction makes paragraph three superfluous. As we have often stated, we assume that the parties included contract terms for a reason and will not embrace a construction that would render a provision meaningless. *Southwick v. City of Rutland*, 2011 VT 53, ¶ 4, 190 Vt. 106, 35 A.3d 113.

¶ 16. Howell's second argument is that, if paragraph three is given effect, it is fatally undermined by a failure of consideration for the release agreement. In this regard, he notes that he received no entitlement to work in the consulting agreement, and asserts that the $18,000 for the vehicle was not an additional benefit in the form of an advance on the $80,000 severance he was owed under the parties' original employment agreement, but merely a credit against the accrued payments which he was already owed from the date of termination — September 15, 2008 — to the date of the agreement — December 30, 2008. Alternatively, he argues that the character of the payment presented a material issue of fact that could not be decided on summary judgment. The trial court concluded otherwise, and again we agree with its reading.

---

[6] Howell's interpretation cannot be correct because it effectively grants him the unilateral power to unravel all of the parties' carefully negotiated agreements by simply refusing to sign the "Release of Claims" at the end of the consulting period. For parties who wished to reach a stable resolution, such a provision makes no sense.

¶ 17. ▮ The "definition of a benefit is extremely broad," and requires simply that the promisor "receive something desired for his or her own advantage" to constitute consideration. *Lloyd's Credit Corp. v. Marlin Mgmt. Servs., Inc.*, 158 Vt. 594, 599, 614 A.2d 812, 815 (1992). We do not have to dig deeply into the facts to find a qualifying benefit. As the trial court here concluded, the promise to sell the vehicle in return for the release of claims was itself sufficient consideration, but even assuming that Howell's characterization of the payment is correct, his receipt of the $18,000 credit for the vehicle "spread out over seven pay periods" rather than "over the course of a full year" constituted an "early payout of at least some of the funds" and a "value [which] supports the . . . conclusion that there was new consideration for Mr. Howell's release." See *id.* at 599, 614 A.2d at 815 (noting that even a "mere expectation or hope of benefit is sufficient to serve as consideration," and that even in commercial transactions "a very slight advantage is sufficient to constitute consideration" (quotations omitted)). The facts and law support these findings and conclusions, and we therefore discern no basis to disturb the judgment.

*Affirmed.*